# HAGEN *v.* UTAH

No. 92–6281.   Argued November 2, 1993—Decided February 23, 1994

400

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SCALIA, KENNEDY, THOMAS, and GINSBURG, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which SOUTER, J., joined, *post*, p. 422.

*Martin E. Seneca, Jr.*, argued the cause for petitioner. With him on the briefs was *Daniel H. Israel*.

*Ronald J. Mann* argued the cause for the United States as *amicus curiae* urging reversal. With him on the briefs were *Solicitor General Days, Acting Assistant Attorney General Flint, Acting Deputy Solicitor General Kneedler, Edward J. Shawaker*, and *Martin W. Matzen*.

*Jan Graham*, Attorney General of Utah, argued the cause for respondent. With her on the brief were *Carol Clawson*, Solicitor General, and *Michael M. Quealy*, Assistant Attorney General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In this case we decide whether the Uintah Indian Reservation was diminished by Congress when it was opened to non-Indian settlers at the turn of the century. If the reservation has been diminished, then the town of Myton, Utah, which lies on opened lands within the historical boundaries of the reservation, is not in "Indian country," see 18 U. S. C.

---

*Robert S. Thompson III, Sandra Hansen*, and *Jeanne S. Whiteing* filed a brief for the Ute Indian Tribe as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of South Dakota et al. by *Mark Barnett*, Attorney General of South Dakota, and *John P. Guhin*, Deputy Attorney General, and for the Attorneys General of their respective States as follows: *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Marc Racicot* of Montana, *Frankie Sue Del Papa* of Nevada, and *Susan B. Loving* of Oklahoma; for Duchesne County, Utah, by *Herbert Wm. Gillespie* and *Jesse C. Trentadue;* for Fremont County, Wyoming, et al. by *James M. Johnson;* for Uintah County, Utah, by *Tom D. Tobin* and *Kenn A. Pugh;* and for the Council of State Governments et al. by *Richard Ruda* and *Charles Rothfeld*.

Briefs of *amici curiae* were filed for the Navajo Nation by *Paul E. Frye;* and for Roosevelt City by *Craig M. Bunnell*.

§ 1151, and the Utah state courts properly exercised criminal jurisdiction over petitioner, an Indian who committed a crime in Myton.

I

On October 3, 1861, President Lincoln reserved about 2 million acres of land in the Territory of Utah for Indian settlement. Executive Order No. 38–1, reprinted in 1 C. Kappler, Indian Affairs: Laws and Treaties 900 (1904). Congress confirmed the President's action in 1864, creating the Uintah Valley Reservation. Act of May 5, 1864, ch. 77, 13 Stat. 63. According to the 1864 Act, the lands were "set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same." *Ibid.* The present-day Ute Indian Tribe includes the descendants of the Indians who settled on the Uintah Reservation.

In the latter part of the 19th century, federal Indian policy changed. See F. Cohen, Handbook of Federal Indian Law 127–139 (1982 ed.). Indians were no longer to inhabit communally owned reservations, but instead were to be given individual parcels of land; any remaining lands were to be opened for settlement by non-Indians. The General Allotment Act, Act of Feb. 8, 1887, ch. 119, 24 Stat. 388, granted the President authority "to allot portions of reservation land to tribal members and, with tribal consent, to sell the surplus lands to [non-Indian] settlers, with the proceeds of these sales being dedicated to the Indians' benefit." *DeCoteau* v. *District County Court for Tenth Judicial District*, 420 U. S. 425, 432 (1975).

Pursuant to the General Allotment Act, Congress in 1894 directed the President to appoint a commission to negotiate with the Indians for the allotment of Uintah Reservation lands and the "relinquishment to the United States" of all unallotted lands. Act of Aug. 15, 1894, ch. 290, § 22, 28 Stat. 337. That effort did not succeed, and in 1898 Congress directed the President to appoint another commission to nego-

tiate an agreement for the allotment of Uintah Reservation lands and the "cession" of unallotted lands to the United States. Act of June 4, 1898, ch. 376, 30 Stat. 429. The Indians resisted those efforts as well. Various bills that would have opened the reservation unilaterally (*i. e.*, without the consent of the Indians) were subsequently introduced in the Senate but were not enacted into law. See Leasing of Indian Lands, Hearings before the Senate Committee on Indian Affairs, S. Doc. No. 212, 57th Cong., 1st Sess., 3 (1902).

In 1902, Congress passed an Act which provided that if a majority of the adult male members of the Uintah and White River Indians consented, the Secretary of the Interior should make allotments by October 1, 1903, out of the Uintah Reservation. Act of May 27, 1902, ch. 888, 32 Stat. 263.[1] The allotments under the 1902 Act were to be 80 acres for each head of a family and 40 acres for each other member of

---

[1] The 1902 Act provided in relevant part:

"That the Secretary of the Interior, with the consent thereto of the majority of the adult male Indians of the Uintah and the White River tribes of Ute Indians, to be ascertained as soon as practicable by an inspector, shall cause to be allotted to each head of a family eighty acres of agricultural land which can be irrigated and forty acres of such land to each other member of said tribes, said allotments to be made prior to October first, nineteen hundred and three, on which date all the unallotted lands within said reservation shall be restored to the public domain: *Provided*, That persons entering any of said land under the homestead law shall pay therefor at the rate of one dollar and twenty-five cents per acre: *And provided further*, That . . . the proceeds of the sale of the lands so restored to the public domain shall be applied, first, to the reimbursement of the United States for any moneys advanced to said Indians to carry into effect the foregoing provisions; and the remainder, under the direction of the Secretary of the Interior, shall be used for the benefit of said Indians. And the sum of seventy thousand and sixty-four dollars and forty-eight cents is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, to be paid to the Uintah and the White River tribes of Ute Indians, under the direction of the Secretary of the Interior, whenever a majority of the adult male Indians of said tribes shall have consented to the allotment of lands and the restoration of the unallotted lands within said reservation as herein provided." 32 Stat. 263–264.

the Tribes. The Act also provided that when the deadline for allotments passed, "all the unallotted lands within said reservation shall be restored to the public domain" and subject to homesteading at $1.25 per acre. *Ibid.* The proceeds from the sale of lands restored to the public domain were to be used for the benefit of the Indians.

A month after the passage of the 1902 Act, Congress directed the Secretary of the Interior to set apart sufficient land to serve the grazing needs of the Indians remaining on the reservation. J. Res. 31, 57th Cong., 1st Sess. (1902), 32 Stat. 744.[2] The resolution clarified that $70,000 appropriated by the 1902 Act was to be paid to the Indians "without awaiting their action upon the proposed allotment in severalty of lands in that reservation and the restoration of the surplus lands to the public domain." *Id.,* at 745.

In January 1903, this Court held that Congress can unilaterally alter reservation boundaries. *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 567–568. On Mar. 3, 1903, Congress directed the Secretary to allot the Uintah lands unilaterally if the Indians did not give their consent by June 1 of that year, and deferred the opening of the unallotted lands "as provided by the [1902 Act]" until October 1, 1904. Act of Mar. 3, 1903,

---

[2] The 1902 Joint Resolution provided in relevant part:

"In addition to the allotments in severalty to the Uintah and White River Utes of the Uintah Indian Reservation in the State of Utah, the Secretary of the Interior shall, before any of said lands are opened to disposition under any public land law, select and set apart for the use in common of the Indians of that reservation such an amount of non-irrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of live stock.

.        .        .        .        .

"The item of seventy thousand and sixty-four dollars and forty-eight cents appropriated by the Act which is hereby supplemented and modified, to be paid to the Uintah and White River tribes of Ute Indians in satisfaction of certain claims named in said Act, shall be paid to the Indians entitled thereto without awaiting their action upon the proposed allotment in severalty of lands in that reservation and the restoration of the surplus lands to the public domain." 32 Stat. 744–745.

ch. 994, 32 Stat. 998.[3]   The 1903 Act also specified that the grazing lands specified in the 1902 Joint Resolution would be limited to 250,000 acres south of the Strawberry River. In 1904, Congress passed another statute that appropriated additional funds to "carry out the purposes" of the 1902 Act, and deferred the opening date "as provided by the [1902 and 1903 Acts]" until Mar. 10, 1905.   Act of Apr. 21, 1904, ch. 1402, 33 Stat. 207.[4]

---

[3] The 1903 Act provided in relevant part:

"[Money is hereby appropriated to] enable the Secretary of the Interior to do the necessary surveying and otherwise carry out the purposes of so much of the Act of May twenty-seventh, nineteen hundred and two, . . . as provides for the allotment of the . . . Uintah and White River Utes in Utah . . . : *Provided, however,* That the Secretary of the Interior shall forthwith send an inspector to obtain the consent of the Uintah and White River Ute Indians to an allotment of their lands as directed by the Act of May twenty-seventh, nineteen hundred and two, and if their consent, as therein provided, can not be obtained by June first, nineteen hundred and three, then the Secretary of the Interior shall cause to be allotted to each of said Uintah and White River Ute Indians the quantity and character of land named and described in said Act: *And provided further,* That the grazing lands to be set apart for the use of the Uintah, White River Utes, and other Indians, as provided by public resolution numbered thirty-one, of June nineteenth, nineteen hundred and two, be confined to the lands south of the Strawberry River on said Uintah Reservation, and shall not exceed two hundred and fifty thousand acres: *And provided further,* That the time for opening the unallotted lands to public entry on said Uintah Reservation, as provided by the Act of May twenty-seventh, nineteen hundred and two, be, and the same is hereby, extended to October first, nineteen hundred and four."   32 Stat. 997–998.

[4] The 1904 Act provided in relevant part:

"That the time for opening the unallotted lands to public entry on the Uintah Reservation, in Utah, as provided by the Acts of May twenty-seventh, nineteen hundred and two, and March third, nineteen hundred and three, be, and the same is hereby extended to March tenth, nineteen hundred and five, and five thousand dollars is hereby appropriated to enable the Secretary of the Interior to do the necessary surveying, and otherwise carry out the purposes of so much of the Act of May twenty-seventh, nineteen hundred and two, . . . as provides for the allotment of the Indians of the Uintah and White River Utes in Utah."   33 Stat. 207–208.

In 1905, Congress again deferred the opening date, this time until September 1, 1905, unless the President were to establish an earlier date. Act of Mar. 3, 1905, ch. 1479, 33 Stat. 1069.[5] The 1905 Act repealed the provision of the 1903 Act limiting the grazing lands to areas south of the Strawberry River. The Act further provided:

> "[T]he manner of opening [reservation] lands for settlement and entry, and for disposing of the same, shall be as follows: That the said unallotted lands . . . shall be

---

[5] The 1905 Act provided in relevant part:

"That so much of the Act of March third, nineteen hundred and three, as provides that the grazing lands to be set apart for the use of the Uintah, White River Utes, and other Indians on the Uintah Reservation, as provided by public resolution numbered thirty-one, of June nineteenth, nineteen hundred and two, shall be confined to the lands south of the Strawberry River, be, and the same is hereby, repealed.

"That the time for opening to public entry the unallotted lands on the Uintah Reservation in Utah having been fixed by law as the tenth day of March, nineteen hundred and five, it is hereby provided that the time for opening said reservation shall be extended to the first of September, nineteen hundred and five, unless the President shall determine that the same may be opened at an earlier date and that the manner of opening such lands for settlement and entry, and for disposing of the same, shall be as follows: That the said unallotted lands . . . shall be disposed of under the general provisions of the homestead and town-site laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof; and no person shall be permitted to settle upon, occupy, or enter any of said lands, except as prescribed in said proclamation, until after the expiration of sixty days from the time when the same are thereby opened to settlement and entry: . . . *And provided further,* That all lands opened to settlement and entry under this Act remaining undisposed of at the expiration of five years from the taking effect of this Act shall be sold and disposed of for cash, under rules and regulations to be prescribed by the Secretary of the Interior, not more than six hundred and forty acres to any one person. The proceeds of the sale of such lands shall be applied as provided in the Act of Congress of May twenty-seventh, nineteen hundred and two, and the Acts amendatory thereof and supplemental thereto." 33 Stat. 1069–1070.

disposed of under the general provisions of the homestead and town-site laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof." *Ibid.*

All lands remaining open but unsettled after five years were to be sold for cash, in parcels up to 640 acres. The "proceeds of the sale of such lands" were to be "applied as provided in the [1902 Act] and the Acts amendatory thereof and supplemental thereto." *Id.*, at 1070.

The Government once again failed to obtain the consent of the Indians. On July 14, 1905, President Roosevelt issued the following Proclamation:

"Whereas it was provided by the [1902 Act], among other things, that on October first, 1903, the unallotted lands in the Uintah Indian Reservation, in the State of Utah, 'shall be restored to the public domain: Provided, That persons entering any of said lands under the homestead laws shall pay therefor at the rate of [$1.25] per acre.'

"And, whereas, the time for the opening of said unallotted lands was extended. to October 1, 1904, by the [1903 Act], and was extended to March 10, 1905, by the [1904 Act], and was again extended to not later than September 1, 1905, by the [1905 Act], which last named act provided, among other things: ['That the said unallotted lands . . . shall be disposed of under the general provisions of the homestead and townsite laws of the United States . . . .']

"Now, therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by said Acts of Congress, do hereby declare and make known that all the unallotted lands in said

reservation . . . will on and after the 28th day of August, 1905, in the manner hereinafter prescribed, and not otherwise, be opened to entry, settlement and disposition under the general provisions of the homestead and townsite laws of the United States." 34 Stat. 3119–3120.

The Proclamation went on to detail a lottery scheme for the allocation of the lands to settlers.

## II

In 1989, petitioner was charged in Utah state court with distribution of a controlled substance. The offense occurred in the town of Myton, which was established within the original boundaries of the Uintah Indian Reservation when the reservation was opened to non-Indian settlement in 1905. Petitioner initially pleaded guilty, but subsequently filed a motion to withdraw his guilty plea. The basis of the motion was that the Utah state courts lacked jurisdiction over petitioner because he was an Indian and the crime had been committed in Indian country. The trial court denied the motion, finding that petitioner is not an Indian.

The state appellate court reversed. It concluded that petitioner is an Indian, a determination that is not at issue in this Court. The court also held that Myton is in Indian country, relying on *Ute Indian Tribe* v. *Utah*, 773 F. 2d 1087 (1985) (en banc), cert. denied, 479 U. S. 994 (1986), in which the Tenth Circuit held that the Uintah Indian Reservation was not diminished when it was opened to settlement in 1905. Because Congress has not granted criminal jurisdiction to the State of Utah to try crimes committed by Indians in Indian country, cf. *Negonsott* v. *Samuels*, 507 U. S. 99, 103 (1993); *Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 471–474 (1979), the appellate court held that the state courts lacked jurisdiction over petitioner. The court accordingly vacated petitioner's conviction.

The Utah Supreme Court reversed on the authority of *State* v. *Perank*, 858 P. 2d 927 (1992), in which the court had held (on the same day as the decision in petitioner's case) that the reservation had been diminished and that Myton was outside its boundaries, and thus that petitioner's offense was subject to state criminal jurisdiction. 858 P. 2d 925 (1992); see *Solem* v. *Bartlett*, 465 U. S. 463, 467 (1984) ("As a doctrinal matter, the States have jurisdiction over unallotted opened lands if the applicable surplus land Act freed that land of its reservation status and thereby diminished the reservation boundaries"). The court accordingly reinstated petitioner's conviction.

We granted certiorari, 507 U. S. 1028 (1993), to resolve the direct conflict between these decisions of the Tenth Circuit and the Utah Supreme Court on the question whether the Uintah Reservation has been diminished.

## III

We first address a threshold question: whether the State of Utah, which was a party to the Tenth Circuit proceedings, should be collaterally estopped from relitigating the reservation boundaries. In *Perank*, the Utah Supreme Court noted that "neither Perank, the Department of Justice, nor the Tribe suggests that the Tenth Circuit's *en banc* decision in *Ute Indian Tribe* has res judicata effect in this case." 858 P. 2d, at 931. Because "[r]es judicata is an affirmative defense in both criminal and civil cases and therefore is waivable," *id.*, at 931, n. 3, the court went on to consider the merits of the State's claim.

Petitioner's only recourse would have been to attack the judgment in *Perank* on the ground that the Utah Supreme Court failed to give effect *sua sponte* to the prior determination in *Ute Indian Tribe* that the reservation had not been diminished. Although that issue is one of federal law, see Restatement (Second) of Judgments § 86 (1982), it was not presented in the petition for a writ of certiorari. It there-

fore is not properly before us. *Yee* v. *Escondido,* 503 U. S. 519, 535–536 (1992); see *Izumi Seimitsu Kogyo Kabushiki Kaisha* v. *U. S. Philips Corp.,* 510 U. S. 27 (1993) *(per curiam).* Moreover, petitioner disavowed the collateral estoppel argument at the petition stage, in response to a brief filed by the Ute Indian Tribe:

> "The question presented in the petition was whether the reservation had been diminished by acts of congress. [This Court's Rule 14.1(a)] does not appear to allow different issues to be raised. The Ute Indian Tribe argues that the Supreme Court of the State of Utah should have reached a different decision in *[Perank]* based on the doctrine of collateral estoppel . . . . Regardless of the opinion held by the Ute Indian Tribe of the *Perank* decision, *the decision has been made and is controlling in petitioner's case.*" Supplemental Brief for Petitioner 2 (filed Dec. 2, 1992) (emphasis added).

Because we see no reason to consider an argument that petitioner not only failed to raise, but also expressly refused to rely upon in seeking a writ of certiorari, we turn to the merits.

## IV

In *Solem* v. *Bartlett,* we recognized:

> "It is settled law that some surplus land Acts diminished reservations, see, *e. g., Rosebud Sioux Tribe* v. *Kneip,* 430 U. S. 584 (1977); *DeCoteau* v. *District County Court,* 420 U. S. 425 (1975), and other surplus land Acts did not, see, *e. g., Mattz* v. *Arnett,* 412 U. S. 481 (1973); *Seymour* v. *Superintendent,* 368 U. S. 351 (1962). The effect of any given surplus land Act depends on the language of the Act and the circumstances underlying its passage." 465 U. S., at 469.

In determining whether a reservation has been diminished, "[o]ur precedents in the area have established a fairly clean

analytical structure," *id.*, at 470, directing us to look to three factors. The most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands. *Ibid.* We have also considered the historical context surrounding the passage of the surplus land Acts, although we have been careful to distinguish between evidence of the contemporaneous understanding of the particular Act and matters occurring subsequent to the Act's passage. *Id.*, at 471. Finally, "[o]n a more pragmatic level, we have recognized that who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land Act diminished a reservation." *Ibid.* Throughout the inquiry, we resolve any ambiguities in favor of the Indians, and we will not lightly find diminishment. *Id.*, at 470, 472; see also *South Dakota* v. *Bourland*, 508 U. S. 679, 687 (1993) (" '[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit' " (quoting *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 269 (1992) (internal quotation marks omitted))).

The Solicitor General, appearing as *amicus* in support of petitioner, argues that our cases establish a "clear-statement rule," pursuant to which a finding of diminishment would require both explicit language of cession or other language evidencing the surrender of tribal interests and an unconditional commitment from Congress to compensate the Indians. See Brief for United States as *Amicus Curiae* 7–8. We disagree. First, although the statutory language must "establis[h] an express congressional purpose to diminish," *Solem*, 465 U. S., at 475, we have never required any particular form of words before finding diminishment, see *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584, 588, and n. 4 (1977). Second, we noted in *Solem* that a statutory expression of congressional intent to diminish, coupled with the provision of a sum certain payment, would establish a nearly conclusive presumption that the reservation had been diminished. 465

U. S., at 470–471. While the provision for definite payment can certainly provide additional evidence of diminishment, the lack of such a provision does not lead to the contrary conclusion. In fact, the statutes at issue in *Rosebud*, which we held to have effected a diminishment, did not provide for the payment of a sum certain to the Indians. See 430 U. S., at 596, and n. 18. We thus decline to abandon our traditional approach to diminishment cases, which requires us to examine all the circumstances surrounding the opening of a reservation.

A

The operative language of the 1902 Act provided for allocations of reservation land to Indians, and that "all the unallotted lands within said reservation shall be *restored to the public domain.*" 32 Stat. 263 (emphasis added). The public domain was the land owned by the Government, mostly in the West, that was "available for sale, entry, and settlement under the homestead laws, or other disposition under the general body of land laws." E. Peffer, The Closing of the Public Domain 6 (1951). "[F]rom an early period in the history of the government it [was] the practice of the President to order, from time to time, . . . parcels of land belonging to the United States to be reserved from sale and set apart for public uses." *Grisar* v. *McDowell*, 6 Wall. 363, 381 (1868). This power of reservation was exercised for various purposes, including Indian settlement, bird preservation, and military installations, "when it appeared that the public interest would be served by withdrawing or reserving parts of the public domain." *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 471 (1915).

It follows that when lands so reserved were "restored" to the public domain—*i. e.*, once again opened to sale or settlement—their previous public use was extinguished. See *Sioux Tribe* v. *United States*, 316 U. S. 317, 323 (1942) (President ordered lands previously reserved for Indian use "'restored to the public domain[,] . . . the same being no longer

needed for the purpose for which they were withdrawn from sale and settlement'"); *United States* v. *Pelican,* 232 U. S. 442, 445–446 (1914). Statutes of the period indicate that Congress considered Indian reservations as separate from the public domain. See, *e. g.,* Act of June 25, 1910, § 6, 36 Stat. 857 (criminalizing forest fires started "upon the public domain, or upon any Indian reservation") (quoted in *United States* v. *Alford,* 274 U. S. 264, 266–267 (1927)). Likewise, in *DeCoteau* we emphasized the distinction between reservation and public domain lands: "That the lands ceded in the other agreements were *returned to the public domain, stripped of reservation status,* can hardly be questioned . . . . The sponsors of the legislation stated repeatedly that the ratified agreements would return the ceded lands to the 'public domain.'" 420 U. S., at 446 (emphasis added).

In *Solem,* the Court held that an Act which authorized the Secretary of the Interior to "'sell and dispose of'" unallotted reservation lands merely opened the reservation to non-Indian settlement and did not diminish it. 465 U. S., at 472–474. Elsewhere in the same statute, Congress had granted the Indians permission to harvest timber on the opened lands "'as long as the lands remain part of the public domain.'" *Id.,* at 475. We recognized that this reference to the public domain "support[ed]" the view that a reservation had been diminished, but that it was "hardly dispositive." *Id.,* at 475. We noted that "even without diminishment, unallotted opened lands could be conceived of as being in the 'public domain' inasmuch as they were available for settlement." *Id.,* at 475, n. 17. The Act in *Solem,* however, did not "restore" the lands to the public domain. More importantly, the reference to the public domain did not appear in the operative language of the statute opening the reservation lands for settlement, which is the relevant point of reference for the diminishment inquiry. Our cases considering *operative* language of restoration have uniformly equated it with a congressional purpose to terminate reservation status.

In *Seymour* v. *Superintendent of Wash. State Peniten-tiary,* 368 U. S. 351 (1962), for example, the question was whether the Colville Reservation, in the State of Washington, had been diminished. The Court noted that an 1892 Act which "'vacated and restored to the public domain'" about one-half of the reservation lands had diminished the reservation as to that half. *Id.,* at 354. As to the other half, Congress in 1906 had provided for allotments to the Indians, followed by the sale of mineral lands and entry onto the surplus lands under the homestead laws. This Court held that the 1906 Act did not result in diminishment: "Nowhere in the 1906 Act is there to be found any language similar to that in the 1892 Act expressly vacating the South Half of the reservation and restoring that land to the public domain." *Id.,* at 355. This Court subsequently characterized the 1892 Act at issue in *Seymour* as an example of Congress' using "clear language of express termination when that result is desired." *Mattz,* 412 U. S., at 504, n. 22. And in *Rosebud,* all nine Justices agreed that a statute which "'restored to the public domain'" portions of a reservation would result in diminishment. 430 U. S., at 589, and n. 5; *id.,* at 618 (Marshall, J., dissenting).

In light of our precedents, we hold that the restoration of unallotted reservation lands to the public domain evidences a congressional intent with respect to those lands inconsistent with the continuation of reservation status. Thus, the existence of such language in the operative section of a surplus land Act indicates that the Act diminished the reservation. Indeed, we have found only one case in which a Federal Court of Appeals decided that statutory restoration language did not terminate a reservation, *Ute Indian Tribe,* 773 F. 2d, at 1092, a conclusion the Tenth Circuit has since disavowed as "unexamined and unsupported." *Pittsburg & Midway Coal Mining Co.* v. *Yazzie,* 909 F. 2d 1387, 1400, cert. denied, 498 U. S. 1012 (1990).

Until the *Ute Indian Tribe* litigation in the Tenth Circuit, every court had decided that the unallotted lands were restored to the public domain pursuant to the terms of the 1902 Act, with the 1905 Act simply extending the time for opening and providing for a few details. *Hanson* v. *United States*, 153 F. 2d 162, 162–163 (CA10 1946); *United States* v. *Boss*, 160 F. 132, 133 (Utah 1906); *Uintah and White River Bands of Ute Indians* v. *United States*, 139 Ct. Cl. 1, 21–23 (1957); *Sowards* v. *Meagher*, 108 P. 1112, 1114 (Utah 1910). Petitioner argues, however, that the 1905 Act changed the "manner" in which the lands were to be opened. That Act specified that the homestead and townsite laws would apply, and so superseded the "restore to the public domain" language of the 1902 Act, language that was not repeated in the 1905 Act. We disagree, because the baseline intent to diminish the reservation expressed in the 1902 Act survived the passage of the 1905 Act.

Every congressional action subsequent to the 1902 Act referred to that statute. The 1902 Joint Resolution provided an appropriation prior to the restoration of surplus reservation lands to the public domain. 32 Stat. 744. The 1903 and 1904 Acts simply extended the deadline for opening the reservations in order to allow more time for surveying the lands, so that the "purposes" of the 1902 Act could be carried out. 32 Stat. 997; 33 Stat. 207. And the 1905 Act recognized that they were all tied together when it provided that the proceeds of the sale of the unallotted lands "shall be applied as provided in the [1902 Act] and the Acts amendatory thereof and supplementary thereto." 33 Stat. 1070. The Congress that passed the 1905 Act clearly viewed the 1902 statute as the basic legislation upon which subsequent Acts were built.

Furthermore, the structure of the statutes requires that the 1905 Act and the 1902 Act be read together. Whereas the 1905 Act provided for the disposition of *unallotted* lands, it was the 1902 Act that provided for allotments to the Indi-

ans.   The 1902 Act also established the price for which the unallotted lands were to be sold, and what was to be done with the proceeds of the sales.   The 1905 Act did not repeat these essential features of the opening, because they were already spelled out in the 1902 Act.   The two statutes—as well as those that came in between—must therefore be read together.

Finally, the general rule that repeals by implication are disfavored is especially strong in this case, because the 1905 Act *expressly* repealed the provision in the 1903 Act concerning the siting of the grazing lands; if Congress had meant to repeal any part of any other previous statute, it could easily have done so.   Furthermore, the predicate for finding an implied repeal is not present in this case, because the opening provisions of the two statutes are not inconsistent: The 1902 Act also provided that the unallotted lands restored to the public domain could be sold pursuant to the homestead laws. Other surplus land Acts which we have held to have effected diminishment similarly provided for initial entry under the homestead and townsite laws.   See *Rosebud, supra,* at 608; *DeCoteau,* 420 U. S., at 442.

## B

Contemporary historical evidence supports our conclusion that Congress intended to diminish the Uintah Reservation. As we have noted, the plain language of the 1902 Act demonstrated the congressional purpose to diminish the Uintah Reservation.   Under the 1902 Act, however, the consent of the Indians was required before the reservation could be diminished; that consent was withheld by the Indians living on the reservation.   After this Court's *Lone Wolf* decision in 1903, Congress authorized the Secretary of the Interior to proceed unilaterally.   The Acting Commissioner for Indian Affairs in the Department of the Interior directed Indian Inspector James McLaughlin to travel to the Uintah Reservation to "endeavor to obtain [the Indians'] consent to the

allotment of lands as provided in the law, and to the restoration of the surplus lands." Letter from A. C. Tonner to James McLaughlin (Apr. 27, 1903), reprinted in S. Doc. No. 159, 58th Cong., 3d Sess., 9 (1905). The Acting Commissioner noted, however, that the effect of the 1903 Act was that "if the [Indians] do not consent to the allotments by the first of June next the allotments are to be made notwithstanding, and the unallotted lands . . . are to be opened to entry" according to the terms of the 1902 Act. *Id.*, at 8–9.

Inspector McLaughlin explained the effect of these recent developments to the Indians living on the Reservation:

> " 'By that decision of the Supreme Court, Congress has the legal right to legislate in regard to Indian lands, and Congress has enacted a law which requires you to take your allotments.
>
> .        .        .        .        .
>
> " 'You say that [the Reservation boundary] line is very heavy and that the reservation is nailed down upon the border. That is very true as applying to the past many years and up to now, but congress has provided legislation which will pull up the nails which hold down that line and *after next year there will be no outside boundary line to this reservation.*' " Minutes of Councils Held by James McLaughlin, U. S. Indian Inspector, with the Uintah and White River Ute Indians at Uintah Agency, Utah, from May 18 to May 23, 1903, excerpted in App. to Brief for Respondent 4a–5a (emphasis added).

Inspector McLaughlin's picturesque phrase reflects the contemporaneous understanding, by him conveyed to the Indians, that the reservation would be diminished by operation of the 1902 and 1903 Acts notwithstanding the failure of the Indians to give their consent.

The Secretary of the Interior informed Congress in February 1904 that the necessary surveying could not be completed before the date set for the opening, and requested

that the opening be delayed. Letter from E. A. Hitchcock to the Chairman of the Senate Committee on Indian Affairs (Feb. 6, 1904), reprinted in S. Doc. No. 159, *supra,* at 17. In the 1904 Act, Congress accordingly extended the time for opening until March 10, 1905, and appropriated additional funds "to enable the Secretary of the Interior to do the necessary surveying" of the reservation lands. 33 Stat. 207. The Secretary of the Interior subsequently informed Congress that a further extension would be necessary because the surveying and allotments could not be completed during the winter. Letter from E. A. Hitchcock to the Chairman of the House Committee on Indian Affairs (Dec. 10, 1904), reprinted in S. Doc. No. 159, *supra,* at 21.

The House of Representatives took up the matter on January 21, 1905. The bill on which debate was held provided that "so much of said lands as will be under the provisions of said acts restored to the public domain shall be open to settlement and entry by proclamation of the President of the United States, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered." H. R. 17474, quoted in 39 Cong. Rec. 1180 (1905). Representative Howell of Utah offered as an amendment "[t]hat for one year immediately following the restoration of said lands to the public domain said lands shall be subject to entry only under the homestead, town-site, and mining laws of the United States." *Ibid.* Significantly, Representative Howell offered his amendment as an addition to, not a replacement for, the language in the bill that explicitly referred to the lands' restoration to the public domain. He explained:

> "In the pending bill these lands, when restored to the public domain, are subject to entry under the general land laws of the United States, coupled with such rules and regulations as the President may prescribe. In my humble judgment there should be some provision such as is embodied in my amendment, limiting the lands in the reservation to entry under the homestead, town-site,

and mining laws alone for one year from the date of the opening. . . .

"Congress should see to it that until such time as those lands easy of access, reclamation, and irrigation are settled by actual home makers the provisions of the homestead law alone shall prevail. This policy is in accord with the dominant sentiment of the time, viz, that the public lands shall be reserved for actual homes for the people." *Id.*, at 1182.

Although the amendment was rejected in the House of Representatives, *id.*, at 1186, the Senate substituted the current version of the 1905 Act, which is similar to the amendment offered by Representative Howell but omits the restoration language of the House version. *Id.*, at 3522. In the hearings on the Senate bill, Senator Teller of Colorado had stated that "I am not going to agree to any entry of that land except under the homestead and town-site entries," because "I am not going to consent to any speculators getting public land if I can help it." Indian Appropriation Bill, 1906, Hearings before the Senate Subcommittee of the Committee on Indian Affairs, 58th Cong., 3d Sess., 30 (1905). Thus, although we have no way of knowing for sure why the Senate decided to limit the "manner" of opening, it seems likely that Congress wanted to limit land speculation. That objective is not inconsistent with the restoration of the unallotted lands to the public domain: Once the lands became public, Congress could of course place limitations on their entry, sale, and settlement.

The Proclamation whereby President Roosevelt actually opened the reservation to settlement makes clear that the 1905 Act did not repeal the restoration language of the 1902 Act. In that document, the President stated that the 1902 Act provided that the unallotted lands were to be restored to the public domain, that the 1903, 1904, and 1905 Acts extended the time for the opening, and that those lands were

now opened for settlement under the homestead laws "by virtue of the power in [him] vested *by said Acts of Congress.*" 34 Stat. 3120 (emphasis added). President Roosevelt thus clearly understood the 1905 Act to incorporate the 1902 Act, and specifically the restoration language. This "unambiguous, contemporaneous, statement, by the Nation's Chief Executive," *Rosebud,* 430 U. S., at 602, is clear evidence of the understanding at the time that the Uintah Reservation would be diminished by the opening of the unallotted lands to non-Indian settlement.

The subsequent history is less illuminating than the contemporaneous evidence. Since 1905, Congress has repeatedly referred to the Uintah Reservation in both the past and present tenses, reinforcing our longstanding observation that "[t]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 348–349 (1963) (internal quotation marks omitted). The District Court in the *Ute Indian Tribe* case extensively cataloged these congressional references, and we agree with that court's conclusion: "Not only are the references grossly inconsistent when considered together, they . . . are merely passing references in text, not deliberate expressions of informal conclusions about congressional intent in 1905." 521 F. Supp. 1072, 1135 (Utah 1981). Because the textual and contemporaneous evidence of diminishment is clear, however, the confusion in the subsequent legislative record does nothing to alter our conclusion that the Uintah Reservation was diminished.

## C

Finally, our conclusion that the statutory language and history indicate a congressional intent to diminish is not controverted by the subsequent demographics of the Uintah Valley area. We have recognized that "[w]hen an area is predominately populated by non-Indians with only a few surviving pockets of Indian allotments, finding that the land remains

Indian country seriously burdens the administration of state and local governments." *Solem*, 465 U. S., at 471–472, n. 12. Of the original 2 million acres reserved for Indian occupation, approximately 400,000 were opened for non-Indian settlement in 1905. Almost all of the non-Indians live on the opened lands. The current population of the area is approximately 85 percent non-Indian. 1990 Census of Population and Housing, Summary Population and Housing Characteristics: Utah, 1990 CPH–1–46, Table 17, p. 73. The population of the largest city in the area—Roosevelt City, named for the President who opened the reservation for settlement— is about 93 percent non-Indian. *Id.*, Table 3, p. 13.

The seat of Ute tribal government is in Fort Duchesne, which is situated on Indian trust lands. By contrast, we found it significant in *Solem* that the seat of tribal government was located on opened lands. 465 U. S., at 480. The State of Utah exercised jurisdiction over the opened lands from the time the reservation was opened until the Tenth Circuit's *Ute Indian Tribe* decision. That assumption of authority again stands in sharp contrast to the situation in *Solem*, where "tribal authorities and Bureau of Indian Affairs personnel took primary responsibility for policing . . . the opened lands during the years following [the opening in] 1908." 465 U. S., at 480. This "jurisdictional history," as well as the current population situation in the Uintah Valley, demonstrates a practical acknowledgment that the Reservation was diminished; a contrary conclusion would seriously disrupt the justifiable expectations of the people living in the area. Cf. *Rosebud, supra*, at 604–605.

V

We conclude that the Uintah Indian Reservation has been diminished by Congress. Accordingly, the town of Myton, where petitioner committed a crime, is not in Indian country and the Utah courts properly exercised criminal jurisdiction

over him. We therefore affirm the judgment of the Utah Supreme Court.

*So ordered.*

JUSTICE BLACKMUN, with whom JUSTICE SOUTER joins, dissenting.

"Great nations, like great men, should keep their word," *FPC* v. *Tuscarora Indian Nation,* 362 U. S. 99, 142 (1960) (Black, J., dissenting), and we do not lightly find that Congress has broken its solemn promises to Indian tribes. The Court relies on a single, ambiguous phrase in an Act that never became effective, and which was deleted from the controlling statute, to conclude that Congress must have intended to diminish the Uintah Valley Reservation. I am unable to find a clear expression of such intent in either the operative statute or the surrounding circumstances and am compelled to conclude that the original Uintah Valley Reservation boundaries remain intact.

## I

### A

Two rules of construction govern our interpretation of Indian surplus-land statutes: we must find clear and unequivocal evidence of congressional intent to reduce reservation boundaries, and ambiguities must be construed broadly in favor of the Indians.[1]  Congress alone has authority to di-

---

[1] "The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians," *County of Oneida* v. *Oneida Indian Nation of N. Y.,* 470 U. S. 226, 247 (1985), and the Indians' unequal bargaining power when agreements were negotiated, see, *e. g., Choctaw Nation* v. *United States,* 119 U. S. 1, 28 (1886); *Jones* v. *Meehan,* 175 U. S. 1, 11 (1899). "[T]reaties were imposed upon [the Indians] and they had no choice but to consent. As a consequence, this Court often has held that treaties with the Indians must be interpreted as they would have understood them, . . . and any doubtful expressions in them should be resolved in the Indians' favor." *Choctaw Nation* v. *Oklahoma,* 397 U. S. 620, 631 (1970). Because Congress' au-

vest Indians of their land, see *United States* v. *Celestine,* 215 U. S. 278, 285 (1909), and "Congress [must] clearly evince an 'intent . . . to change . . . boundaries' before diminishment will be found." *Solem* v. *Bartlett,* 465 U. S. 463, 470 (1984), quoting *Rosebud Sioux Tribe* v. *Kneip,* 430 U. S. 584, 615 (1977); see also *DeCoteau* v. *District County Court for Tenth Judicial District,* 420 U. S. 425, 444 (1975); *Mattz* v. *Arnett,* 412 U. S. 481, 505 (1973). Absent a "plain and unambiguous" statement of congressional intent, *United States* v. *Santa Fe Pacific R. Co.,* 314 U. S. 339, 346 (1941), we find diminishment only "[w]hen events surrounding the [Act's] passage . . . *unequivocally* reveal a widely held, contemporaneous understanding" that such was Congress' purpose. *Solem,* 465 U. S., at 471 (emphasis added).

In diminishment cases, the rule that "legal ambiguities are resolved to the benefit of the Indians" also must be given "the broadest possible scope." *DeCoteau,* 420 U. S., at 447; see also *Carpenter* v. *Shaw,* 280 U. S. 363, 367 (1930) ("Doubtful expressions are to be resolved in favor of the [Indians]"); *United States* v. *Nice,* 241 U. S. 591, 599 (1916); *United States* v. *Celestine,* 215 U. S., at 290. For more than 150 years,[2] we have applied this canon in all areas of Indian law to construe

thority to legislate unilaterally on behalf of the Indians derives from the presumption that Congress will act with benevolence, courts "have developed canons of construction that treaties and other federal action should when possible be read as protecting Indian rights and in a manner favorable to Indians." F. Cohen, Handbook of Federal Indian Law 221 (1982 ed.) (hereinafter Cohen). The principle "has been applied to the particular issue of reservation termination to require that the intent of Congress to terminate be clearly expressed." *Id.,* at 43.

[2] The maxim that ambiguous provisions should be construed in favor of the Indians was first articulated by Justice McLean in *Worcester* v. *Georgia,* 6 Pet. 515, 582 (1832) (concurring opinion) ("The language used in treaties with the Indians should never be construed to their prejudice"); see also *Choate* v. *Trapp,* 224 U. S. 665, 675 (1912) ("This rule of construction has been recognized, without exception, for more than a hundred years").

congressional ambiguity or silence, in treaties, statutes, executive orders, and agreements, to the Indians' benefit.[3]

Although the majority purports to apply these canons in principle, see *ante,* at 410–411, it ignores them in practice, resolving every ambiguity in the statutory language, legislative history, and surrounding circumstances in favor of the State and imputing to Congress, where no clear evidence of congressional intent exists, an intent to diminish the Uintah Valley Reservation.

B

The special canons of construction are particularly relevant in the diminishment context because the allotment statutes are often ambiguous regarding their effect on tribal jurisdiction and reservation boundaries. During the 19th century, land was considered Indian country and thus subject to tribal jurisdiction "whenever the Indian title had not been extinguished." *Bates* v. *Clark,* 95 U. S. 204, 208 (1877). In passing the General Allotment Act of Feb. 8, 1887, 24 Stat. 388, and related statutes, Congress no doubt assumed that tribal jurisdiction would terminate with the sale of Indian lands and that the reservations eventually would be abol-

---

[3] The canon has been applied to treaties and statutes to preserve broad tribal water rights, see, *e. g., Choctaw Nation* v. *Oklahoma,* 397 U. S., at 631; *Winters* v. *United States,* 207 U. S. 564, 576 (1908), hunting and fishing rights, see, *e. g., Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U. S. 658, 675 (1979); *Antoine* v. *Washington,* 420 U. S. 194, 199–200 (1975); *Menominee Tribe* v. *United States,* 391 U. S. 404, 406, n. 2, 413 (1968); *Tulee* v. *Washington,* 315 U. S. 681, 684–685 (1942); *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 89 (1918), and other land rights, see, *e. g., County of Oneida* v. *Oneida Indian Nation of N. Y.,* 470 U. S., at 247–248; *United States* v. *Santa Fe Pacific R. Co.,* 314 U. S. 339, 354 (1941); *Minnesota* v. *Hitchcock,* 185 U. S. 373, 396 (1902); and to protect tribes from state taxation authority, see, *e. g., Bryan* v. *Itasca County,* 426 U. S. 373, 392 (1976); *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 174 (1973); *Squire* v. *Capoeman,* 351 U. S. 1, 6–7 (1956); *Carpenter* v. *Shaw,* 280 U. S. 363, 366–367 (1930); *Choate* v. *Trapp,* 224 U. S., at 675; *The Kansas Indians,* 5 Wall. 737, 760 (1867).

ished. See *Solem*, 465 U. S., at 468. The General Allotment Act itself did not terminate the reservation system, however, but was intended to assimilate[4] the Indians by transforming them into agrarians and opening their lands to non-Indians. See *Mattz*, 412 U. S., at 496. After this goal of the allotment policies proved to be a disastrous failure,[5] Congress reversed course with the passage of the Indian Reorganization Act of 1934, 48 Stat. 984, as amended, 25 U. S. C. § 461 *et seq.* (1988 ed. and Supp. IV), which allowed surplusopened Indian lands to be restored to tribal ownership. Finally, in 1948 Congress resolved the ensuing jurisdictional conflicts by extending tribal jurisdiction to encompass lands owned by non-Indians within reservation boundaries. See Act of June 25, 1948, 62 Stat. 757 (codified as 18 U. S. C. § 1151 (defining "Indian country" as including "all land within the limits of any Indian reservation under the jurisdiction of the United States Government")).[6] Reservation boundaries,

---

[4] "The theory of assimilation was used to justify the [allotment] legislation as beneficial to Indians. Proponents of assimilation policies maintained that if Indians adopted the habits of civilized life they would need less land, and the surplus would be available for white settlers. The taking of these lands was justified as necessary for the progress of civilization as a whole." Cohen 128.

[5] The 138 million acres held exclusively by Indians in 1887 when the General Allotment Act was passed had been reduced to 52 million acres by 1934. See 2 F. Prucha, The Great Father 896 (1984). John Collier testified before Congress that nearly half of the lands remaining in Indian hands were desert or semidesert, and that 100,000 Indians were "totally landless as a result of allotment." Hearings on H. R. 7902 before the House Committee on Indian Affairs, 73d Cong., 2d Sess., 17 (1934); see also D. Otis, The Dawes Act and the Allotment of Indian Lands 124–155 (Prucha ed. 1973) (discussing results of the allotments by 1900).

[6] Congress' extension of tribal jurisdiction to reservation lands owned by non-Indians served pragmatic ends. "[W]here the existence or nonexistence of an Indian reservation, and therefore the existence or nonexistence of federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement officers operating in the area will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense . . . is in the State or Federal

rather than Indian title, thus became the measure of tribal jurisdiction.

As a result of the patina history has placed on the allotment Acts, the Court is presented with questions that their architects could not have foreseen. It resolves the resulting statutory ambiguities by requiring clear evidence of specific congressional intent to diminish a reservation based on the language and circumstances of each individual land Act. See *Solem*, 465 U. S., at 469. Accordingly, statutory language alone of sale and settlement to non-Indians is insufficient to establish diminishment. "The mere fact that a reservation has been opened to settlement does not necessarily mean that the opened area has lost its reservation status." *Rosebud*, 430 U. S., at 586–587; see also *DeCoteau*, 420 U. S., at 444 ("[R]eservation status may survive the mere opening of a reservation to settlement"). "[S]ome surplus land Acts diminished reservations, . . . and other surplus land Acts did not," *Solem*, 465 U. S., at 469, and we have refused to find diminishment based on language of opening or sale absent additional unequivocal evidence of a congressional intent to reduce reservation boundaries or divest all Indian interests. Thus, in *Seymour* v. *Superintendent of Wash. State Penitentiary*, 368 U. S. 351, 355 (1962), the Court found no diminishment under a statute providing for the settlement and entry of surplus lands under the homestead laws, and in *Mattz*, 412 U. S., at 495, the Court concluded that a statute opening the reservation "'subject to settlement, entry, and purchase under the laws of the United States granting homestead rights'" did "not, alone, recite or even suggest that Congress intended thereby to terminate the . . . Reservation," *id.*, at 497. Most recently, in *Solem*, 465 U. S., at 472, we unanimously agreed that a statute authorizing the Secretary of

---

Government. Such an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151." *Seymour* v. *Superintendent of Wash. State Penitentiary*, 368 U. S. 351, 358 (1962) (footnote omitted).

the Interior to "'sell and dispose'" of surplus Indian lands did not diminish the reservation.

In contrast, the only two cases in which this Court previously has found diminishment involved statutes and underlying tribal agreements to "'cede, sell, relinquish, and convey to the United States all [the Indians'] claim, right, title, and interest'" in unallotted lands, *DeCoteau*, 420 U. S., at 439, n. 22, or to "'cede, surrender, grant, and convey to the United States all [the Indians'] claim, right, title, and interest'" in a defined portion of the reservation, *Rosebud*, 430 U. S., at 591, n. 8. The Court held that in the presence of statutory language "precisely suited" to diminishment, *id.*, at 597, supported by the express consent of the tribes, "the intent of all parties to effect a clear conveyance of all unallotted lands was evident." *DeCoteau*, 420 U. S., at 436, n. 16.[7] I need hardly add that no such language or underlying Indian consent accompanies the statute at issue in this case.

## II

## A

The majority opinion relies almost exclusively on the fact that the Act of May 27, 1902, 32 Stat. 263, "restored [the unallotted lands] to the public domain" to conclude that the Uintah Valley Reservation was diminished. I do not agree that this ambiguous phrase can carry the weight of evincing a clear congressional purpose. We never authoritatively have defined the public domain, and the phrase "has no official definition. In its most general application, a public domain is meant to include all the land owned by a government—any government, anywhere." E. Peffer, The Closing

---

[7] Other statutes have used express language of geographical termination. See 15 Stat. 221 ("the Smith River reservation is hereby discontinued") and 33 Stat. 218 ("the reservation lines . . . are hereby, abolished").

of the Public Domain 5 (1951) (footnote omitted).[8]  Most commonly, the public domain and public lands "have been defined as those lands subject to sale or other disposal under the general land laws." *Utah Div. of State Lands* v. *United States,* 482 U. S. 193, 206 (1987), quoting E. Baynard, Public Land Law and Procedure § 1.1, p. 2 (1986); see also *Kindred* v. *Union Pacific R. Co.,* 225 U. S. 582, 596 (1912) (the term "public lands" ordinarily was "used to designate such lands as are subject to sale or other disposal under general laws"); *Union Pacific R. Co.* v. *Harris,* 215 U. S. 386, 388 (1910); *Newhall* v. *Sanger,* 92 U. S. 761, 763 (1876) ("The words 'public lands' are habitually used . . . to describe such as are subject to sale or other disposal under general laws").

Nothing in our precedents stating that lands reserved from the public domain were "reserved from sale," *Grisar* v. *McDowell,* 6 Wall. 363, 381 (1868), or "withdrawn from sale and settlement," *Sioux Tribe* v. *United States,* 316 U. S. 317, 323 (1942) (internal quotation marks omitted), however, demonstrates that restoration of those lands to the public domain was "inconsistent" with continued reservation status, *ante,* at 416.  Under 19th-century Indian-land policies, non-Indians could not purchase, and generally could not enter, lands reserved for exclusive use by Indian tribes.  Indian reservations obviously were not part of the public domain to the extent that they were reserved from non-Indian purchase.  The opening of these lands under the allotment Acts, on the other hand, necessarily restored *all* such lands to the public domain, in the sense that the lands were made

---

[8] *Although the phrase* "public domain" *appears infrequently in our precedents, this Court has used it interchangeably with references to* "public land[s]."  See, *e. g., United States* v. *Midwest Oil Co.,* 236 U. S. 459, 468 (1915).  Black's Law Dictionary 1229 (6th ed. 1990) defines the public domain as "[l]and and water in possession of and owned by the United States and the states individually . . . .  *See also* Public Lands."  See *Amoco Production Co.* v. *Gambell,* 480 U. S. 531, 549, n. 15 (1987) ("reject[ing] the assertion that the phrase 'public lands,' in and of itself, has a precise meaning, without reference to a definitional section or its context in a statute").

available for entry and sale. Restoration of lands to the public domain thus establishes only that the lands were opened to access by non-Indians and to settlement and purchase, a condition "completely consistent with continued reservation status." *Mattz,* 412 U. S., at 497.

In our most recent diminishment case, we unanimously rejected the argument adopted by the majority here—that "Congress would refer to opened lands as being part of the public domain only if the lands had lost all vestiges of reservation status." *Solem,* 465 U. S., at 475. Instead, we observed that "even without diminishment, unallotted opened lands could be conceived of as being in the 'public domain' inasmuch as they were available for settlement." *Id.,* at 475, n. 17; see also Whether Surplus Lands in Uintah and Ouray Reservation are Indian Lands, 2 Op. Sol. 1205 (1943) ("[R]estored to the public domain" is "only a method of indicating that the lands are to be subject to disposition under the public land laws"). *Solem* concerned an allotment statute that referred to opened lands as "part of the public domain," 465 U. S., at 475, and as "within the respective reservations thus diminished," *id.,* at 474 (internal quotation marks omitted). The Court refused to infer diminishment from this language, however, finding "considerable doubt as to what Congress meant in using these phrases." *Id.,* at 475, n. 17. We concluded that when balanced against the applicable statute's stated goal of opening the reservation for sale to non-Indians, "these two phrases cannot carry the burden of establishing an express congressional purpose to diminish." *Id.,* at 475.

The majority's focus on the fact that the public domain language in *Solem* was not in the operative portion of the statute, see *ante,* at 413, ignores the *Solem* Court's additional conclusion that the public domain is an ambiguous concept that is not incompatible with reservation status. Furthermore, the fact that the public domain language in *Solem* was not operative and did not use the word "restored" should

be irrelevant under the majority's own analysis, since the character of the lands as "part of the public domain" would be "inconsistent" with their continued reservation status. *Ante,* at 413, 416. Under the majority's present interpretation, the opened lands could not have been both part of the public domain and part of the reservation. *Solem,* however, concluded precisely the opposite.[9]

In light of this Court's unanimous reasoning in *Solem* and our common interpretation of the public domain as lands "subject to sale . . . under general laws," *Kindred,* 225 U. S., at 596, therefore, I cannot conclude that the isolated phrase "restored to the public domain" is an "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests," *Solem,* 465 U. S., at 470. This language bears no relation to the "plain and unambiguous" language that our precedents require or that we found controlling in *DeCoteau* and *Rosebud.* Restoration to the public domain simply allowed Indian lands to be sold, something we repeatedly have said is never sufficient to establish an intent to diminish.

### B

Although the Court relies on the negotiation history of the 1902 Act and that of the Act of Mar. 3, 1903, ch. 994, 32 Stat. 998, to support its conclusion, nothing in the negotiations with the Ute Indian Tribe "unequivocally reveal[s] a widely held, contemporaneous understanding" that the Uintah Res-

---

[9] The Court never before has held that an isolated reference to the public domain is sufficient to support a finding of diminishment. In every case relied upon by the majority for this contention, the relevant public domain language was accompanied by express additional language demonstrating such intent. See *DeCoteau,* 420 U. S., at 446 ("returned to the public domain, *stripped of reservation status*") (emphasis added). Three of the cases cited by the majority, in fact, discuss the same statute, 27 Stat. 62. See *Seymour,* 368 U. S., at 354 ("'*vacated* and restored to the public domain'") (emphasis added); *Mattz* v. *Arnett,* 412 U. S. 481, 504, n. 22 (1973) (same); *United States* v. *Pelican,* 232 U. S. 442, 445 (1914) (same).

ervation boundaries would be diminished. *Solem*, 465 U. S., at 471. The ever-present Inspector James McLaughlin, who negotiated the *Rosebud* and *DeCoteau* agreements that this Court found to contain express language of disestablishment, used no comparable language here.[10] Instead, McLaughlin spoke largely in terms of "opening" the reservation to use by non-Indians.[11] The Indians similarly responded primarily in terms of "opening" and opposed the proposed sale.[12]

The Court isolates a single comment by McLaughlin from the six days of negotiations to argue that diminishment was understood. But McLaughlin's "picturesque" statement that "'there will be no outside boundary line to this

---

[10] In negotiating the 1901 Agreement, for example, McLaughlin explained to the Rosebud Sioux Indians that "'[t]he cession of Gregory County' by ratification of the Agreement 'will leave your reservation a compact, and almost square tract . . . about the size and area of Pine Ridge Reservation.'" *Rosebud*, 430 U. S., at 591–592.

[11] See, *e. g.*, Minutes of Councils Held by Inspector James McLaughlin, U. S. Indian Inspector, with the Uintah and White River Ute Indians, at Uintah Agency, Utah, from May 18 to May 23, 1903, excerpted in App. to Brief for Duchesne County, Utah, as *Amicus Curiae* 333a, 336a (hereinafter Minutes) ("After you have taken your allotments the remaining land is to be opened for settlement"), *id.*, at 342a ("The surplus lands will be opened to settlement"), *id.*, at 354a ("As certainly as the sun rises tomorrow [your reservation] is to be opened"), *id.*, at 358a ("[I]t is not for you to say whether your reservation is to be opened or not"), *id.*, at 359a ("Do not lose sight of the fact that the reservation is to be opened"), *id.*, at 363a ("The reservation will certainly be opened").

[12] See, *e. g.*, *id.*, at 339a ("When they put us on the reservation . . . they were not to open it"), *id.*, at 340a ("The president made this reservation here for the Indians and it ought not to be opened up"), *id.*, at 343a ("I don't want you to talk to us about opening our reservation. . . . We don't want this reservation opened, and we do not want White people coming in among us"), *id.*, at 344a ("[W]e do not want this reservation thrown open"), *ibid.* ("[T]hey told us that this land would be ours always and that it would never be opened"), *id.*, at 346a ("We are not going to talk about opening our reservation"), *ibid.* ("[W]e do not want to have the reservation thrown open"), *id.*, at 351a ("I am on this reservation, and I do not want this land thrown open"), *id.*, at 357a ("[T]he Indians do not want the reservation opened").

reservation,'" *ante,* at 417, cannot be understood as a statement that the reservation itself was being abolished, since the Uintah Valley Reservation unquestionably survived the opening. McLaughlin's discussion, which went on to explain that each Indian "will have a boundary to your individual holdings," Minutes 368a, is more readily understood as a reference to a change in *title* to the reservation lands, which clearly would have occurred under the Acts, or to the fact that the lands within the reservation boundary would be open to entry by non-Indians.

McLaughlin's statements immediately following this passage strongly suggest that some Indian interests survived the opening. In response to Indian concerns regarding lifting of the reservation line, McLaughlin stated:

> "You fear that you are going to be confined to the tract of land allotted. That is not so, and I will explain a little more clearly. . . . Your Agency will be continued just the same as now; the Agent will have full jurisdiction just the same as now, to protect your interests." *Id.,* at 368a–369a.

Elsewhere, McLaughlin confirmed this statement: "My friends, when you take your allotment you are deprived of no privileges you have at the present time." *Id.,* at 365a.

Although the discussions regarding the allotments concededly are subject to varying interpretations, none of them provides the type of unequivocal evidence of an intent to diminish boundaries or abolish all Indian interests that we require where statutory intent to diminish the reservation is not express. On their face, the negotiations establish that the 1902 Act would have done "no more than open the way for non-Indian settlers to own land on the reservation." *Seymour,* 368 U. S., at 356. Moreover, the record contains no evidence whatsoever of the Indians' contemporaneous understanding regarding the Act of Mar. 3, 1905, 33 Stat. 1069, which is the operative Act in this case.

What the negotiations do show is that the Indians overwhelmingly opposed the allotments. After six days of meetings between McLaughlin and the Ute Tribe, only 82 of the 280 adult male Utes agreed to sign the allotment agreement, see Letter of May 30, 1903, from McLaughlin to the Secretary of the Interior, reprinted in H. Doc. No. 33, 58th Cong., 1st Sess., 5 (1903), and McLaughlin reported that the Ute Indians were "unanimously opposed to the opening of their reservation." *Id.*, at 7. Although after *Lone Wolf* v. *Hitchcock*, 187 U. S. 553 (1903), Congress unquestionably had authority to terminate reservations unilaterally, we relied heavily on the presence of tribal consent in *Rosebud* and *DeCoteau* to find a contemporaneous intent to diminish. In *Solem*, by contrast, we held that the surrounding circumstances "fail[ed] to establish a clear congressional purpose to diminish the reservation" because the 1908 Act there "did not begin with an agreement between the United States and the Indian Tribes." 465 U. S., at 476. To the extent that the absence of formal tribal consent counseled against a finding of diminishment in *Solem*, therefore, the Ute Indians' persistent withholding of consent requires a similar conclusion here.

## III

### A

Even if the 1902 Act's public domain language were express language of diminishment, I would conclude that the Uintah Valley Reservation was not diminished because that provision did not remain operative in the 1905 Act. It was this latter Act that actually opened the Uintah Valley Reservation to sale and settlement, and that Act's language on its face does not support a finding of diminishment. The Act provided in relevant part:

> "That the time for *opening to public entry* the unallotted lands on the Uintah Reservation in Utah having been fixed by law . . . it is hereby provided that the time

for *opening said reservation* shall be extended . . . and that the *manner of opening such lands for settlement and entry,* and for disposing of the same, shall be as follows: That the said unallotted lands . . . *shall be disposed of under the general provisions of the homestead and town-site laws of the United States and shall be opened to settlement and entry.* . . . *And provided further,* That . . . [t]he proceeds of the sale of such lands shall be applied as provided in the Act of Congress of May twenty-seventh, nineteen hundred and two, and the Acts amendatory thereof and supplemental thereto." 33 Stat. 1069–1070 (emphasis added in part).

This language, which speaks only of opening the lands for entry and settlement, is indistinguishable from that which we previously have concluded "cannot be interpreted to mean that the reservation was to be terminated." *Mattz,* 412 U. S., at 504; see also *Solem,* 465 U. S., at 473; and *Seymour,* 368 U. S., at 356. Neither the Court nor the parties dispute this conclusion.

Nor did the 1905 Act preserve the 1902 Act's public domain provision. In contrast to the Act of Apr. 21, 1904, 33 Stat. 207, the 1905 Act did not open the lands "as provided by" the 1902 Act, *ibid.,* nor was it passed expressly to "carry out the purposes of" the 1902 Act, as were both the 1903 and 1904 Acts. See 32 Stat. 997 and 33 Stat. 207. On its face, the 1905 Act preserved only one portion of the earlier statute— that portion regarding payment of the proceeds from the unallotted land sales. Other provisions of the 1902 Act unquestionably were superseded, since the 1905 Act restricted settlement of the opened lands to that under "the general provisions of the homestead and town-site laws," 33 Stat. 1069, rather than under the general laws as provided by the 1902 Act. Thus, the plain language of the 1905 Act, which actually opened the reservation, did *not* restore the unallot-

ted lands to the public domain, but simply opened the lands for settlement.

Nothing in this case suggests that the 1902 Act established a baseline intent to diminish the reservation like that the Court confronted in *Rosebud*. In that case, an original statute and agreement with the Indians to "cede, surrender, grant, and convey" all their interests in designated lands unequivocally demonstrated a collective intent to diminish the Great Sioux Reservation. See 430 U. S., at 591, n. 8. Both the legislative history of two subsequent allotment statutes and the presence of majority tribal consent to those land allotments established that this original intent to diminish was preserved. All parties agreed that the later statutes "must have diminished [the] reservation if the previous Act did." See *Solem*, 465 U. S., at 473, n. 15.

By contrast, the 1902 Act contains no equivalent language of diminishment, and none of the Acts at issue here were supported by Indian consent. Prior congressional attempts to open the Uintah Valley Reservation demonstrate that the requirement of the "consent thereto of the majority of the adult male Indians of the Uintah and the White River tribes" was central to the 1902 Act. 32 Stat. 263. In 1894, 1896, 1898, and 1902, Congress enacted statutes requiring Indian consent to open the Uintah Valley Reservation, but none of these Acts became effective because that consent was not forthcoming.[13] After the passage of the 1903 Act and the

---

[13] The Indian Appropriations Act of Aug. 15, 1894, ch. 290, § 20, 28 Stat. 337, authorized a commission to allot the Uncompahgre Reservation unilaterally, but required that the same commission "negotiate and treat" with the Uintah Valley Reservation Indians for the relinquishment of their lands, "and if possible, procure [their] consent" to such allotments. See § 22, *ibid.* A House Report explained that in contrast to the Uncompahgre Indians, who had "no title to the lands they occupy" and occupied them only temporarily, the Uintah Indians were "the owners of the lands within the reservation, because [the enabling Act] . . . provided that the lands within the Uintah Reservation should be 'set apart for the permanent

decision in *Lone Wolf,* Congress dispatched Inspector McLaughlin to negotiate the allotments with the Tribe. Throughout this period, the Ute Tribe resisted the allotments, twice sending delegations to Washington to voice their opposition. See *Ute Indian Tribe* v. *Utah,* 521 F. Supp. 1072, 1113, 1125 (Utah 1981). When Congress finally opened the Uintah Reservation to non-Indian settlement in 1905, it removed the public domain language from the opening statute and severely restricted non-Indian access to the opened lands. Even if the 1902 Act contained express language of termination, then, the facts of this case would much more closely mirror those in *Mattz,* 412 U. S., at 503–504, where Congress ultimately abandoned its prior attempts to "abolish" the reservation in favor of simply opening the lands to entry and settlement.

Concededly, nothing in the 1905 Act expressly repealed the 1902 Act's public domain language, and the 1905 Act could

---

settlement and exclusive occupation of the Indians.'" H. R. Rep. No. 660, 53d Cong., 2d Sess., 1, 2–3 (1894), quoting Act of May 5, 1864, ch. 77, 13 Stat. 63. In order to allot the Uintah Reservation lands, therefore, it was "first necessary to obtain the consent of the Indians residing thereon." H. R. Rep. No. 660, at 3. The Act of June 10, 1896, ch. 398, 29 Stat. 341– 342, and the Act of June 4, 1898, ch. 376, 30 Stat. 429, also conditioned opening of the reservation on Indian consent. See *Ute Indian Tribe* v. *Utah,* 521 F. Supp. 1072, 1111–1114 (Utah 1981) (discussing pre-1902 efforts to open the Uintah Reservation).

Congress rebuffed all subsequent attempts to allot the reservation unilaterally, see Hearings before the Senate Committee on Indian Affairs, S. Doc. No. 212, 57th Cong., 1st Sess., 111 (1902) (proposal of Rep. Sutherland of Utah), or to sever large portions of the reservation, see S. 145, 57th Cong., 1st Sess. (1902), reproduced in S. Doc. No. 212, at 3–4 (proposal of Sen. Rawlins of Utah). In hearings regarding the reservation in 1902, Indian Affairs Commissioner Jones testified: "There is a sort of feeling among the ignorant Indians that they do not want to lose any of their land. That is all there is to it; and I think before you can get them to agree . . . you have got to use some arbitrary means to open the land." *Id.,* at 5. Congress did not heed this advice, however, but again required the Ute Tribe's consent in the 1902 Act.

be construed as either preserving that provision or replacing it. Ordinarily under these circumstances, the canon that repeals by implication are disfavored might require us to construe the later Act's silence as consistent with the earlier statute. See *ante,* at 416. The Court's invocation of this canon here, however, "fails to appreciate . . . that the standard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana* v. *Blackfeet Tribe,* 471 U. S. 759, 766 (1985).

In *Blackfeet Tribe,* the Court refused to rely on the rule against repeals by implication under circumstances analogous to those presented here. That case involved the question whether a 1924 provision authorizing States to tax tribal mineral royalties remained in force under a 1938 statute which was silent on the taxation question but which repealed all prior inconsistent provisions. The State argued that because the 1938 statute neither expressly repealed the earlier taxation provision nor was inconsistent with it, the rule against repeals by implication required a finding that the State's taxation power remained intact. The Court rejected this argument as, among other things, inconsistent with two fundamental canons of Indian law: that a State may tax Indians only when Congress has clearly expressed such an intent, and that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Ibid.* Cf. *Carpenter* v. *Shaw,* 280 U. S. 363, 366–367 (1930); *Choate* v. *Trapp,* 224 U. S. 665, 675 (1912).

A similar construction is required here. The 1905 Act does not purport to fulfill the "purposes" of the 1902 Act nor to preserve its public domain language; the Act instead simply opens the lands for settlement under the homestead and townsite laws. Under these circumstances, both the requirements that congressional intent must be explicit and that ambiguous provisions must be construed in favor of the Indians compel a resolution in favor of petitioner Hagen. Although a "canon of construction is not a license to disre-

gard clear expressions of tribal and congressional intent," *DeCoteau*, 420 U. S., at 447, no such clear expression is evident here.

### B

The legislative history of the 1905 Act supports the conclusion that Congress materially altered the operative language in the 1902 Act by deleting the public domain provision. Like the 1902 Act, the House version of the 1905 bill, H. R. 17474, provided "[t]hat so much of said lands as will be under the provisions of said acts *restored to the public domain* shall be open to settlement and entry" under the general land laws. 39 Cong. Rec. 1180 (1905) (emphasis added). Representative Howell of Utah, in a proposed amendment that was *not* ultimately adopted, sought to limit non-Indian entry under this bill "to entry only under the homestead, town-site, and mining laws of the United States." *Ibid.* Howell's proposal, however, would have referred to the public domain in two places:

> "so much of said lands as will be under the provisions of said acts *restored to the public domain* shall be open to settlement and entry by proclamation of the President. . . . *And further provided,* That for one year immediately following the *restoration of said lands to the public domain* said lands shall be subject to entry only under the homestead, town-site, and mining laws of the United States." *Ibid.* (emphasis added in part).

Senate bills later introduced by Senator Smoot of Utah, S. 6867 and S. 6868, 58th Cong., 3d Sess. (1905) (which ultimately were adopted in relevant part as the 1905 Act), also limited the opening to entry under the homestead and townsite laws but struck the House bill's public domain language. In its place, S. bill 6867 stated

> "[t]hat the time for *opening to public entry* the unallotted lands having been fixed by law . . . it is hereby provided that the *manner of opening* such lands for settle-

ment and entry, and for disposing of the same shall be as follows: That the said unallotted lands . . . shall be disposed of under the general provisions of the homestead and town site laws of the United States" (emphasis added).

No subsequent attempt was made to reintroduce the public domain language into the Senate bills. When the House and Senate bills were submitted to the Conference Committee, the Committee again struck the House version containing the public domain language and replaced it with the Senate bill. See 39 Cong. Rec. 3919 (1905). Congress adopted this conference bill as the 1905 Act.

The legislative history thus demonstrates that Congress both removed the public domain language from the 1905 Act and restricted entry to the homestead and townsite laws. Although the Court attempts to dismiss the altered language of the 1905 Act as evidence that "Congress wanted to limit land speculation," *ante*, at 419, this reasoning explains only the presence of the homestead and townsite limitation; it does not explain Congress' simultaneous *deletion* of the public domain language. We do not know why this latter change was made. Possibly Congress thought the language had no substantive meaning at all; possibly the deletion was a response to the Indians' continued withholding of consent, or it is possible that opening lands under the homestead and townsite laws was incompatible with their restoration to the public domain and thus to sale "under general laws." See *Newhall* v. *Sanger*, 92 U. S., at 763. We do know, however, that we must construe doubt regarding Congress' intent to the Indians' benefit when we are left, as we are here, without the "clear statement of congressional intent to alter reservation boundaries," necessary for a finding of diminishment. *Solem*, 465 U. S., at 478.

President Theodore Roosevelt's Proclamation shed no competing light on Congress' intent, but simply summarized the language of the allotment statutes. The operative portion

of the Proclamation declared that "all the unallotted lands" would "in the manner hereinafter prescribed, and not otherwise, be opened to entry, settlement and disposition under the general provisions of the homestead and townsite laws." 34 Stat. 3120. Thus, the crucial portion of the Proclamation under which the lands actually were opened restricted the opening to the terms of the 1905 Act. Furthermore, all other contemporaneous Presidential Proclamations regarding the reservation universally referred to the 1905 Act rather than the 1902 Act as the opening authority. See Presidential Proclamation of July 14, 1905, 34 Stat. 3116 (Uintah forest reserve); Proclamation of Aug. 3, 1905, 34 Stat. 3141 (Uintah reservoir and agricultural lands); Proclamation of Aug. 14, 1905, 34 Stat. 3143 (townsites); Proclamation of Aug. 14, 1905, 34 Stat. 3143–3144 (reservoir lands).

## C

Although contemporary demographics and the historical exercise of jurisdiction may provide "one additional clue as to what Congress expected" in opening reservation lands, *Solem,* 465 U. S., at 472, in that case, we unanimously agreed:

"There are, of course, limits to how far we will go to decipher Congress' intention in any particular surplus land Act. *When both an Act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands,* we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening. *Mattz* v. *Arnett,* 412 U. S., at 505; *Seymour* v. *Superintendent,* 368 U. S. 351 (1962)." 465 U. S., at 472 (emphasis added).

Absent other plain and unambiguous evidence of a congressional intent, we never have relied upon contemporary demo-

graphic or jurisdictional considerations to find diminishment. Cf. *Rosebud Sioux Tribe* v. *Kneip,* 430 U. S. 584 (1977). While these factors may support a finding of diminishment where congressional intent already is clear, therefore, the Court properly does not contend that they may be controlling where Congress' purpose is ambiguous.

Aside from their tangential relation to historical congressional intent, there are practical reasons why we are unwilling to rely heavily on such criteria. The history of the western United States has been characterized, in part, by state attempts to exert jurisdiction over Indian lands. Cf. *United States* v. *Kagama,* 118 U. S. 375, 384 (1886) ("[The Indians] owe no allegiance to the States, and receive from them no protection. Because of the local ill feeling, the people of the States where they are found are often their deadliest enemies"). And the exercise of state jurisdiction here has not been uncontested. The Constitution of the Ute Indian Tribe, which was approved by the Secretary of the Interior in 1937, defines the Tribe's jurisdiction as extending "to the territory within the original confines of the Uintah and Ouray Reservation," quoted in *Ute Indian Tribe,* 521 F. Supp., at 1075. See also Ute Law and Order Code § 1–2–2 (1975), set forth in *Ute Indian Tribe,* 521 F. Supp., at 1077, n. 8. More than two decades ago, *amicus* Roosevelt City agreed to the limited exercise of tribal jurisdiction within its city limits. See Memorandum of Agreement between Roosevelt City and the Ute Tribe, Jan. 11, 1972, cited in *Ute Indian Tribe,* 521 F. Supp., at 1077, n. 8. Federal agencies also have provided services to Indians residing in the disputed areas for many years. In fact, after reviewing the substantial jurisdictional contradictions and confusion in the record on this question, the District Court in *Ute Indian Tribe* concluded: "One thing is certain: the jurisdictional history of the Uintah and Ouray Reservation is not one of 'unquestioned' exercise of state authority." *Id.,* at 1146.

## IV

One hundred thirty years ago, Congress designated the Uintah Valley Reservation "for the permanent settlement and exclusive occupation of" the Ute Indians. Act of May 5, 1864, ch. 77, 13 Stat. 63. The 1905 opening of the reservation constituted a substantial breach of Congress' original promise, but that opening alone is insufficient to extinguish the Ute Tribe's jurisdiction. Nothing in the "face of the Act," its "surrounding circumstances," or its "legislative history" establishes a clear congressional purpose to diminish the Uintah Reservation. *DeCoteau,* 420 U. S., at 445 (internal quotation marks omitted). I appreciate that jurisdiction often may not be neatly parsed among the States and Indian tribes, but this is the inevitable burden of the path this Nation has chosen. Under our precedents, the lands where petitioner's offense occurred are Indian country, and the State of Utah lacked jurisdiction to try him for that crime. See 18 U. S. C. § 1151.

I respectfully dissent.