HOGNER v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:HOGNER v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 HOGNER v. STATE
2021 OK CR 4
Case Number: F-2018-138
Decided: 03/11/2021
TRAVIS JOHN HOGNER, Appellant v. STATE OF OKLAHOMA, Appellee.
Cite as: 2021 OK CR 4, __ __

 

 

O P I N I O N 

LUMPKIN, JUDGE:[1]

¶1 Appellant Travis John Hogner was charged and tried by jury for Feloniously Pointing a Firearm (21 O.S.Supp.2012, § 1289.16) or in the alternative Domestic Assault with a Dangerous Weapon (21 O.S.Supp.2014, § 644) (Count I); Possession of a Firearm, After Former Conviction of a Felony (21 O.S. Supp.2014, § 1283) (Counts II and III); Kidnapping (21 O.S.Supp.2012, § 751 (Count V); Interference with Emergency Telephone Call, misdemeanor (21 O.S.2011, § 1211.1) (Count VIII); and Domestic Assault and Battery, Second or Subsequent Offense (21 O.S.Supp.2014, § 644) (Count IX), all felonies were After Former Conviction of Two or More Felonies, in the District Court of Craig County, Case No. CF-2015-263.[2] In the first stage of trial, the jury found Appellant not guilty in Counts I, V, VIII, and IX. In the second stage of trial, the jury found Appellant guilty in Count II but not guilty in Count III. In the third stage of trial, the jury found Appellant guilty of two or more prior felony convictions and recommended a sentence of fifty (50) years imprisonment. The Honorable H.M. Wyatt, III, Associate District Judge, sentenced Appellant in accordance with the jury's recommendation.[3]

¶2 In Proposition I, Appellant claims the District Court lacked jurisdiction to try him. Appellant argues that he is a citizen of the Miami Tribe of Oklahoma and the crime occurred within the boundaries of the Cherokee Nation.

¶3 Pursuant to McGirt v. Oklahoma, 140 S.Ct. 2452 (2020) Appellant's claim raises two separate questions: (a) his Indian status and (b) whether the crime occurred in Indian Country. These issues require fact-finding. We therefore remanded this case to the District Court of Craig County for an evidentiary hearing.

¶4 Recognizing the historical and specialized nature of this remand for evidentiary hearing, we requested the Attorney General and District Attorney work in coordination to effect uniformity and completeness in the hearing process. Upon Appellant's presentation of prima facie evidence as to his legal status as an Indian and as to the location of the crime as Indian Country, the burden shifts to the State to prove it has subject matter jurisdiction. The District Court was ordered to determine whether Appellant has some Indian blood and is recognized as an Indian by a tribe or the federal government. The District Court was also directed to determine whether the crime occurred in Indian Country. The District Court was directed to follow the analysis set out in McGirt to determine: (1) whether Congress established a reservation for the Cherokee Nation; and (2) if so, whether Congress specifically erased those boundaries and disestablished the reservation. In so doing, the District Court was directed to consider any evidence the parties provided, including but not limited to treaties, statutes, maps, and/or testimony.

¶5 We also directed the District Court that in the event the parties agreed as to what the evidence would show with regard to the questions presented, the parties may enter into a written stipulation setting forth those facts upon which they agree and which answer the questions presented and provide the stipulation to the District Court. The District Court was also ordered to file written findings of fact and conclusions of law with this Court.

¶6 An evidentiary hearing was timely held before the Honorable Shawn S. Taylor, District Judge, and an Order on Remand from that hearing was timely filed with this Court. The record indicates that appearing before the District Court were attorneys from the office of the Attorney General of Oklahoma, the Craig County District Attorney's Office, appellate defense counsel, and the office of the Attorney General of the Cherokee Nation.

¶7 In its Order on Remand, the District Court stated that the State of Oklahoma and Appellant stipulated to Defendant/Appellant's "Indian status by virtue of his tribal membership and proof of blood quantum." Further, "based upon the stipulations provided", the Court "specifically finds Defendant/Appellant (1) has some Indian blood and (2) is recognized as an Indian by a tribe or federal government. The Defendant/Appellant is an Indian."

¶8 Regarding whether the crime occurred in Indian country, the Order states that the "State of Oklahoma and Defendant/Appellant stipulated that the crime occurred within the historical boundaries of the Cherokee Nation. The State takes no position as to the facts underlying the existence, now or historically, of the alleged Cherokee Nation Reservation."

¶9 In determining whether Congress established a reservation for the Cherokee Nation, the District Court stated that it considered the following:

1. The Cherokee Nation is a federally recognized Indian tribe. 84 C.F.R. § 1200 (2019).

2. The current boundaries of the Cherokee Nation encompass lands in a fourteen-county area within the borders of the State of Oklahoma, including all of Adair, Cherokee, Craig, Nowata, Sequoyah, and Washington Counties, and portions of Delaware, Mayes, McIntosh, Muskogee, Ottawa, Rogers, Tulsa and Wagoner Counties as indicated in Combined Hearing Exhibit 1, tab 3.

3. The Cherokee Nation's treaties are to be considered on their own terms, in determining reservation status. McGirt v. Oklahoma, 140 S.Ct. 2452 (2020).

4. In McGirt the United States Supreme Court noted that Creek treaties promised a "permanent home" that would be "forever set apart" and assured a right to self-government on lands that would lie outside both the legal jurisdiction and geographic boundaries of any state. McGirt, 140 S.Ct. at 2451-62. As such, the Supreme Court found that "Under any definition, this was a [Creek] reservation." McGirt, 140 S.Ct. at 2461.

5. The Cherokee treaties were negotiated and finalized during the same period of time as the Creek treaties, contained similar provisions that promised a permanent home that would be forever set apart, and assured a right to self-government on lands that lie outside both the legal jurisdiction and geographic boundaries of any state.

6. The 1833 Cherokee treaty "solemnly pledged" a "guarantee" of seven million acres to the Cherokee on new lands in the West "forever". Treaty with the Western Cherokee Preamble, Feb. 14 1833, 7 Stat. 414

7. The 1833 Cherokee treaty used precise geographic terms to describe the boundaries of the new Cherokee lands, and provided that a patent would issue as soon as reasonably practical. Art. 1, 7 Stat. 414.

8. The 1835 Cherokee treaty was ratified two years later "with a view to re-unite their people in one body and to secure to them a permanent home for themselves and their posterity". In what became known as Indian Territory, "without the territorial limits of the state sovereignties," and "where they could establish and enjoy a government of their choice, and perpetuate such a state of society as might be consonant with their views, habits and condition." Treaty with the Cherokee, Dec. 29, 1835, 7 Stat. 478 and Holden v. Jay, 84 U.S. 211,237-38 (1872).

9. Like the Creek treaty promises, the United States' treaty promises to Cherokee Nation "weren't made gratuitously." McGirt, 140 S.Ct at 2460. Under the 1835 treaty, Cherokee Nation "cede[d], relinquish[ed], and convey[ed]" all its aboriginal lands east of the Mississippi River to the United States. Arts. 1, 7 Stat. 478. In return the United States agreed to convey to Cherokee Nation, by fee patent, seven million acres in Indian Territory within the same boundaries as described in the 1833 treaty, plus "a perpetual outlet west." Art. 2, 7 Stat. 478.

10. The 1835 Cherokee treaty described the United States' conveyance to the Cherokee Nation of the new lands in Indian territory as a cession; required Cherokee removal to the new lands; covenanted that none of the new lands would be "included within the territorial limits or jurisdiction of any State or Territory" without tribal consent; and secured "to the Cherokee nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government...within their own country," so as long as they were consistent with the Constitution and laws enacted by Congress regulating trade with Indians. Arts. 1, 5, 8, 19, 7 Stat. 478.

11. On December 31, 1838, President Van Buren executed a fee patent to the Cherokee Nation for the new lands in Indian Territory. Cherokee Nation v. Hitchcock, 187 U.S. 294, 297 (1902). The title was held by the Cherokee Nation "for the common use and equal benefit of all the members." Cherokee Nation v. Hitchcock, 187 U.S. at 307; see also Cherokee Nation v. JourneyCake, 155 U.S. 196, 207 (1894). Fee title is not inherently incompatible with reservation status, and establishment of a reservation does not require a "particular form of words." McGirt, I40 S.Ct. at 2475, citing Masey v. Wright, 54 S.W. 807, 810 (Indian Ter. 1900) and Minnesota v. Hitchcock, 185 U.S. 373, 390 (1902).

12. The 1846 Cherokee treaty required federal issuance of a deed to the Cherokee Nation for lands it occupied, including the "purchased" 800,000-acre tract in Kansas (known as the Neutral Lands) and the "outlet west." Treaty with the Cherokee, Aug. 6, 1846, art. 1, 9 Stat. 871.

13. The 1866 Cherokee treaty resulted in Cherokee cessions of lands in Kansas and the Cherokee Outlet and required the United States, at its own expense, to cause the Cherokee boundaries to be marked "by permanent and conspicuous monuments by two commissioners one of whom be designated by the Cherokee nation council." Treaty with the Cherokee, July 19, 1866, art. 21, 14, Stat. 799.

14. The 1866 Cherokee treaty "re-affirmed and declared to be in full force" all previous treaty provisions "not inconsistent with the provisions of" the 1866 treaty and provided that nothing in the 1866 treaty "shall be constructed as an acknowledgment by the United States or as relinquishment by Cherokee Nation of any claims or demands under the guarantees of former treaties," except as expressly provided in the 1866 treaty. Art. 31, 14 Stat. 799.

15. Under McGirt the "most authoritative evidence of [a tribe's] relationship to the land....lies in the treaties and statues that promised the land to the Tribe in the first place." McGirt, 140 S.Ct. at 2475-76.

¶10 The District Court found that "as result of the treaty provisions referenced above and related federal statutes . . . Congress did establish a Cherokee Reservation as required under the analysis set out in McGirt v. Oklahoma."

¶11 Further, regarding whether Congress specifically erased the boundaries or disestablished the Cherokee Reservation, the District Court considered:

1. The current boundaries, indicated on the map found at tab 3 of the Combined Hearing Exhibit 1, are the boundaries established of the Cherokee Reservation by the 1833 and 1835 Cherokee treaties, diminished only by two express cessions.

2. First the 1866 treaty expressly ceded the Nation's patented lands in Kansas, consisting of a two and one half mile wide tract known as the Cherokee Strip and the 800,000-acre Neutral Lands, to the United States. Art. 17, 14 Stat. 799.

3. Second the 1866 treaty authorized settlement of other tribes in a portion of the Nation's land west of its current western boundary (within the area known as the Cherokee Outlet) and required payment for those lands, stating that the Cherokee Nation would "retain the right of possession of and the jurisdiction over all said country... until thus sold and occupied, after which their jurisdiction and right of possession to terminate forever as to each of said districts thus sold and occupied." Art. 16, 14 Stat. 799.

4. The Cherokee Outlet cession was finalized by an 1891agreement and ratified by Congress in 1893 (1891 Agreement). Act of Mar. 3, 1893, Ch.209, § 10, 27, Stat. 612, 640-43.

5. The 1891 Agreement provided that the Cherokee nation "shall cede and relinquish all its title, claim, and interest of every kind and character in and to that part of the Indian Territory" encompassing a strip of land bounded by Kansas on the North and the Creek Nation on the south, and located between the ninety-sixth degree west longitude and the one hundredth degree west longitude (i.e., the Cherokee Outlet). See United States v. Cherokee Nation, 202 U.S. 101, 105-106 (1906).

6. The 1893 federal statute that ratified the 1891 agreement required payment of a sum certain to the Cherokee Nation and provided that, upon payment, the ceded lands would "become and be taken to be, and treated as, a part of the public domain," except for such lands allotted under the Agreement to certain described Cherokees farming the lands. 27 Stat. 612, 640-43; United States v. Cherokee Nation, 202 U.S. at 112.

7. Cherokee Nation did not cede or restore any other portion of the Cherokee Reservation to the public domain in the 1891 Agreement. No evidence was presented that any other cession has occurred since that time.

8. The original 1839 Cherokee Constitution established boundaries as described in the 1833 treaty, and the Constitution as amended in 1866 recognized those same boundaries, "subject to such modification as may made necessary" by the 1866 treaty. 1839 Cherokee Constitution, art., 1, § 1, reprinted in Volume 1 of West's Cherokee Nation Code Annotated.

9. Cherokee Nation's most recent Constitution, a 1999 provision of its 1975 Constitution was ratified by Cherokee citizens in 2003 and provides: The boundaries of the Cherokee Nation territory shall be those described by the patents of 1893 and 1846 diminished only by the Treaty of July 19, 1866 and the act of Mar. 3, 1893. 1999 Cherokee Constitution. Art.2.

¶12 The District Court also noted that the State "made it clear through argument and briefing" that the "State of Oklahoma takes no position as to the facts underlying the existence, now or historically, of the alleged Cherokee Reservation" and that "no evidence or argument was presented by the State specifically regarding disestablishment or boundary erasure of the Cherokee Reservation."

¶13 The District Court concluded its order by stating, "regardless of where the burden of production is placed, no evidence was presented to this Court to establish Congress explicitly erased or disestablished the boundaries of the Cherokee Nation or that the State of Oklahoma has jurisdiction in this matter. As a result, the Court finds the Defendant/Appellant is an Indian and that the crime occurred in Indian Country."

¶14 Both Appellant and the State were given the opportunity to file response briefs addressing issues from the evidentiary hearing. Appellant argues that "since the Indian status was dealt with entirely by stipulation" his brief concerns only "the issue of whether the crime occurred in Indian Country". Appellant asserts the parties agreed that the crimes occurred "within the historical boundaries of the Cherokee Nation" and therefore, "the only questions before the district court were whether a reservation had ever been established for the Cherokees and whether it still exists today."

¶15 Reviewing the treaties presented at the evidentiary hearing under the standard of review set forth in McGirt, Appellant argues this Court should adopt the findings of the District Court in holding that Congress created a reservation for the Cherokees and that the Cherokee Reservation was never disestablished. Appellant asserts that just like with the Creek Reservation, "there is no statute evincing anything like the present and total surrender of all tribal interests in the affected lands", citing McGirt, 140 S.Ct. at 2464. Appellant concludes that as the State cannot, and did not, point to any such language regarding the Cherokee Reservation, this Court should find that Congress did not disestablish the reservation for the Cherokees.

¶16 In its response brief, the State acknowledges the District Court accepted the parties' stipulation to Appellant's Indian status based on documentation showing Appellant had ¼ degree Indian blood and was a member of the Miami Tribe of Oklahoma on the date of the crime. The State also asserts the District Court applied McGirt and found Congress did establish a Cherokee Reservation and that "no evidence was presented . . . to establish Congress explicitly erased or disestablished the boundaries of the Cherokee Nation or that the State of Oklahoma had jurisdiction in this matter . . and that the crime occurred in Indian Country." The State contends that should this Court find Appellant is entitled to relief based on the District Court's findings, this Court should stay any order reversing the conviction for thirty (30) days so that the appropriate authorities can review the case and determine whether it is appropriate to file charges and take custody of Appellant. Cf. 22 O.S. 2011, § 846.

¶17 After thorough consideration of this proposition and the entire record before us on appeal including the original record, transcripts, and briefs of the parties, we find that under the law and the evidence relief is warranted. While the State stipulated to Appellant's status as an Indian, the State did not join in the defense's proposed stipulation regarding the existence of the Cherokee Reservation and that it has not been disestablished. The State simply took no position and presented no argument or evidence regarding the defense evidence. This acquiescence has created a legal void in this Court's ability to adjudicate properly the facts underlying Appellant's argument. This Court is left with only the trial court's conclusions of law to review for an abuse of discretion. An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue. State v. Delso, 2013 OK CR 5, ¶ 5, 298 P.3d 1192, 1194.

¶18 Based upon the record before us, the District Court's Order is supported by the evidence presented at the evidentiary hearing. We therefore find Appellant has met his burden of establishing his status as an Indian, having ¼ degree Indian blood and being a member of the Miami Tribe of Oklahoma on the date of the crime. We also find the District Court appropriately applied McGirt to determine that Congress did establish a Cherokee Reservation and that no evidence was presented showing that Congress explicitly erased or disestablished the boundaries of the Cherokee Reservation or that the State of Oklahoma had jurisdiction in this matter. We find the State of Oklahoma did not have jurisdiction to prosecute Appellant in this matter. The Judgments and Sentences in this case are hereby reversed and the case remanded to the District Court of Craig County with instructions to dismiss the case.[4]

DECISION 

¶19 The JUDGMENTS and SENTENCES are REVERSED AND REMANDED with instructions to Dismiss. The MANDATE is not to be issued until twenty (20) days from the delivery and filing of this decision.[5]

 

AN APPEAL FROM THE DISTRICT COURT OF CRAIG COUNTY
THE HONORABLE SHAWN S. TAYLOR, DISTRICT JUDGE

 

 
 
 
 APPEARANCES AT TRIAL

 DANNY JOSEPH
 NICOLLETTE BRANDT
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR DEFENDANT

 MATTHEW J. BALLARD
 DISTRICT ATTORNEY
 BRIAN SURBER
 ASST. DISTRICT ATTORNEY
 210 W. DELAWARE, STE. 202
 VINITA, OK 74301

 MIKE HUNTER
 ATTORNEY GENERAL OF OKLAHOMA
 CAROLINE E.J. HUNT
 HANNAH WHITE
 ASST. ATTORNEYS GENERAL
 313 N.E. 21ST ST.
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR THE STATE

 SARA HILL
 ATTORNEY GENERAL, CHEROKEE NATION
 P.O. BOX 1533
 TAHLEQUAH, OK 74465
 
 
 APPEARANCES ON APPEAL

 LISBETH L. McCARTY
 DANNY JOSEPH
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR APPELLANT

 MIKE HUNTER
 ATTORNEY GENERAL
 OF OKLAHOMA
 CAROLINE E.J. HUNT
 HANNAH WHITE
 ASST. ATTORNEYS GENERAL
 313 N.E. 21ST ST.
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR THE STATE
 
 
 

 

OPINION BY: LUMPKIN, J.
KUEHN, P.J..: Concur in Results
ROWLAND, V.P.J.: Concur in Results
LEWIS, J.: Concur in Results
HUDSON, J.: Specially Concur

FOOTNOTES

[1] As stated in my separate writing in Bosse v. State, 2021 OK CR 3, __ P.3d __ (Lumpkin, J., concurring in result), I am bound by my oath and adherence to the Federal-State relationship under the U.S. Constitution to apply the edict of the majority opinion in McGirt v. Oklahoma, 140 S.Ct. 2452 (2020). However, I continue to share the position of Chief Justice Roberts' dissent in McGirt, that at the time of Oklahoma Statehood in 1907, all parties accepted the fact that Indian reservations in the state had been disestablished and no longer existed.

[2] A demurrer to Counts IV, VI, and VII, three misdemeanor counts of Threatening to Perform Act of Violence (21 O.S.2011, § 1378), was granted before the case was sent to the jury.

[3] Appellant must serve 85% of his sentence before becoming eligible for parole consideration. 21 O.S.2011, § 13.1.

[4] This resolution renders the other seven (7) propositions of error raised in Appellant's brief moot.

[5] By withholding the issuance of the mandate for 20 days, the State's request for time to determine further prosecution is rendered moot.

KUEHN, PRESIDING JUDGE, CONCURRING IN RESULT:

¶1 I agree with the Majority that the State of Oklahoma had no jurisdiction to try Appellant, and his case must be dismissed. First, I want to commend all the attorneys and the trial court for the care and thought with which they have approached this -- for Oklahoma -- unprecedented situation. All parties thoroughly researched the issue, brought to the trial court the relevant facts and law, and carefully considered their positions. The trial court provided this Court with thoughtful, detailed findings of fact and conclusions of law.

¶2 For this reason I cannot agree with the Majority's characterization of the State's position as "acquiescence." In the Order remanding the case for an evidentiary hearing, this Court left open the possibility that the parties would enter into stipulations of fact or law. The parties did so here. In addition to those stipulations, the State chose to take no position on the establishment or disestablishment of the Cherokee Reservation. I believe that decision reflected the State's best legal assessment of the situation, given the clear ruling in McGirt and the treaty law surrounding the Cherokee Reservation. The State should be thanked for conserving judicial resources and entering into the spirit of our Order.

¶3 Nor do I agree that the State's position left a "void" in the record. In any adversarial proceeding, a party may choose to present evidence and give argument. Here, as our Order remanding made clear, Appellant had the burden to show by prima facie evidence his Indian status and that the crime was committed in Indian Country. Once Appellant made this minimal showing, the burden was on the State to show that it had jurisdiction. To aid the trial court, the Appellant and the Cherokee Nation, acting as amicus, provided the court with maps, treaties and other law relevant to the jurisdictional issue. In fulfilling its burden, the State chose not to augment or contest this law and evidence. As I explain above, that was a responsible choice, and one entirely consistent with effective representation. There was a full record below and a full record on appeal. The trial court's findings and conclusions clearly set forth the details of the evidence it used to make its decisions.

¶4 I agree that the trial court's findings of fact were supported by the record, and there is no abuse of discretion. I would adopt the conclusions of law. Finding that Appellant is Indian, the Cherokee Reservation was not disestablished, and the crime was committed within reservation boundaries, I agree the case must be reversed with instructions to dismiss.

ROWLAND, VICE-PRESIDING JUDGE, CONCURRING IN RESULT:

¶1 I agree with nearly every word in the majority's opinion, including its holding that existing law compels a conclusion that the lands comprising the Cherokee Nation in Oklahoma constitute an Indian reservation. I do not join, however, in the view that the position the State has taken leaves a legal void or negatively affects the standard of review by which we are to judge this case.

¶2 The State has agreed that Hogner is an Indian for purposes of federal criminal law, and that the crimes here took place on lands within the historical boundaries of the Cherokee Nation. The State took no position as to whether those lands ever have or still do constitute a reservation, and offered no evidence or argument to rebut Hogner's claim that a Cherokee Reservation remains intact today. Clearly, the State is aware that the reasoning of McGirt v. Oklahoma, 591 U.S. ___, 140 S.Ct. 2452 (2020), involving the Muscogee Creek Reservation, likely applies to the Cherokee lands as well. The Court, in McGirt, found the existence of a Muskogee Creek Reservation in a large part of eastern Oklahoma, even though neither the tribe, local governmental units in that part of the state, nor the State of Oklahoma, had ever behaved since statehood as though they believed a reservation still existed. It seems to me the State is consistent in its long-held position, effectively standing mute and leaving it to the district court to expand McGirt to the Cherokee lands. This is a reasonable position to take and one that litigants in criminal cases take from time to time.

¶3 Nor do I find that the State's position negatively affects our standard of review or ability to decide this case. Had the State taken the position that no Cherokee Reservation exists today, and had the district court nonetheless ruled against the State, we would still have that ruling in the district court's order to adjudicate.

¶4 Finally, I wish to make clear that our decision today, consistent with McGirt, finds the existence of the Cherokee Reservation only for purposes of federal versus state jurisdiction in criminal law. I also point out, consistent with my separate writing in Bosse v State, 2021 OK CR 3, ___P.3d___, that the Major Crimes Act does not affect the State of Oklahoma's subject matter jurisdiction, but rather allows the exercise of federal criminal jurisdiction to effectively preempt the exercise of similar state authority.

¶5 Accordingly, I concur in the result.

LEWIS, JUDGE, CONCURRING IN RESULTS:

¶1 I write separately to address the notion that McGirt v. Oklahoma, 140 S.Ct. 2452 (2020), addresses something less than subject matter jurisdiction over an Indian who commits a crime in Indian Country or over any person who commits a crime against an Indian in Indian Country. McGirt, of course, serves as the latest waypoint for our discussion on the treatment of criminal cases arising within the historic boundaries of Indian reservations which were granted by the United States Government many years ago. McGirt, 140 S.Ct. at 2460, 2480. The main issue in McGirt was whether those reservations were disestablished by legislative action at any point after being granted.

¶2 McGirt deals specifically, and exclusively, with the boundaries of the reservation granted to the Muscogee (Creek) Nation. McGirt, 140 S.Ct. at 2459, 2479. However, the other Indian Nations comprising the Five Civilized Tribes have historical treaties with language indistinct from the treaty between the Muscogee (Creek) Nation and the federal government. Therefore, this case involving a crime occurring within the historical boundaries of the Cherokee Nation Reservation must be analyzed in the same manner as the boundaries of the Muscogee (Creek) Nation Reservation. The District Court below conducted a thorough analysis and concluded that the reservation was not disestablished. I agree with this conclusion.[1]

¶3 McGirt was also clear that if the reservation was not disestablished by the U.S. Congress, Oklahoma has no right to prosecute Indians for crimes committed within the historical boundaries of the Indian reservation. McGirt, 140 S.Ct. at 2460. Therefore, because the Cherokee Nation Reservation was not disestablished, the State of Oklahoma has no authority to prosecute Indians for crimes committed within the boundaries of the Cherokee Nation Reservation as was the case here, nor does Oklahoma have jurisdiction over any person who commits a crime against an Indian within the boundaries of the Cherokee Nation Reservation. The federal government has exclusive jurisdiction over those cases. 18 U.S.C. § 1153(a).

¶4 A lack of subject matter jurisdiction leaves a court without authority to adjudicate a matter. This Court has held that subject matter jurisdiction cannot be conferred by consent, nor can it be waived, and it may be raised at any time. Armstrong v. State, 1926 OK CR 259, 248 P. 877, 878; Cravatt v. State, 1992 OK CR 6, ¶ 7, 825 P.2d 277, 280; Magnan v. State, 2009 OK CR 16, ¶¶ 9 & 12, 207 P.3d 397, 402 (holding that jurisdiction over major crimes in Indian Country is exclusively federal).

¶5 Because the issue in this case is one of subject matter jurisdiction, I concur that this case must be reversed and remanded with instructions to dismiss.

FOOTNOTES

[1] The Opinion indicates that there is some "legal void" because the State acquiesced to the District Court's findings, thus we are limited to review for abuse of discretion. Where there is arbitrary or unreasonable action by a District Court, this Court has the power to intervene. We cannot because there simply is no evidence that Congress disestablished the Chickasaw Nation Reservation by clearly expressed intent as required by McGirt. McGirt, 140 S.Ct. at 2463; see Nebraska v. Parker, 136 S.Ct. 1072, 1079 (2016).

HUDSON, J., SPECIALLY CONCURRING:

¶1 Today's decision applies McGirt v. Oklahoma, 140 S. Ct. 2452 (2020) to the facts of this case. I fully concur in the majority's opinion based on the stipulations below concerning Appellant's Indian status and the location of these crimes within the historic boundaries of the Cherokee Reservation. Under McGirt, the State cannot prosecute Appellant because of his Indian status and the location of this crime within Indian Country as defined by federal law. I therefore as a matter of stare decisis fully concur in today's decision. 

¶2 I further agree that the State's failure to take a position in this case on whether the Cherokee Nation ever had, or has, a reservation prevents us from definitively resolving that issue here. The State's tactic of passivity has created a legal void in this Court's ability to adjudicate properly the facts underlying Appellant's argument. This Court is left with only the trial court's conclusions of law to review for an abuse of discretion. Today's decision correctly finds no abuse of discretion based on the record evidence presented. But we should not establish as binding precedent that the Cherokee Reservation was never disestablished based on this record.

¶3 I also join Judge Rowland's observation in his special writing that the Major Crimes Act does not affect the State of Oklahoma's subject matter jurisdiction in criminal cases but, rather, involves the exercise of federal criminal jurisdiction to effectively preempt the exercise of similar state authority.

¶4 Finally, I write separately to note that McGirt resurrects an odd sort of Indian reservation. One where a vast network of cities and towns dominate the regional economy and provide modern cultural, social, educational and employment opportunities for all people on the reservation. Where the landscape is blanketed by modern roads and highways. Where non-Indians own property (lots of it), run businesses and make up the vast majority of inhabitants. On its face, this reservation looks like any other slice of the American heartland--one dotted with large urban centers, small rural towns and suburbs all linked by a modern infrastructure that connects its inhabitants, regardless of race (or creed), and drives a surprisingly diverse economy. This is an impressive place--a modern marvel in some ways--where Indians and non-Indians have lived and worked together since at least statehood, over a century.

¶5 McGirt orders us to forget all of that and instead focus on whether Congress expressly disestablished the reservation. We are told this is a cut-and-dried legal matter. One resolved by reference to treaties made with the Five Civilized Tribes dating back to the nineteenth century. Ignore that Oklahoma has continuously asserted jurisdiction over this land since statehood, let alone the modern demographics of the area.

¶6 The immediate effect under federal law is to prevent state courts from exercising criminal jurisdiction over a large swath of Greater Tulsa and much of eastern Oklahoma. Yet the effects of McGirt range much further. Crime victims and their family members in a myriad of cases previously prosecuted by the State can look forward to a do-over in federal court of the criminal proceedings where McGirt applies. And they are the lucky ones. Some cases may not be prosecuted at all by federal authorities because of issues with the statute of limitations, the loss of evidence, missing witnesses or simply the passage of time. All of this foreshadows a hugely destabilizing force to public safety in eastern Oklahoma.

¶7 McGirt must seem like a cruel joke for those victims and their family members who are forced to endure such extreme consequences in their case. One can certainly be forgiven for having difficulty seeing where--or even when--the reservation begins and ends in this new legal landscape. Today's decision on its face does little to vindicate tribal sovereignty and even less to persuade that a reservation in name only is necessary for anybody's well-being. The latter point has become painfully obvious from the growing number of cases that come before this Court where non-Indian defendants are challenging their state convictions using McGirt because their victims were Indian.

¶8 Congress may have the final say on McGirt. In McGirt, the court recognized that Congress has the authority to take corrective action, up to and including disestablishment of the reservation. We shall see if any practical solution is reached as one is surely needed. In the meantime, cases like Appellant's remain in limbo until federal authorities can work them out. Crime victims and their families are left to run the gauntlet of the criminal justice system once again, this time in federal court. And the clock is running on whether the federal system can keep up with the large volume of new cases undoubtedly heading their way from state court.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2021 OK CR 6, 485 P.3d 867, SIZEMORE v. STATE
Cited
 2021 OK CR 7, 485 P.3d 873, SPEARS v. STATE
Discussed
 2021 OK CR 8, 485 P.3d 250, GRAYSON v. STATE
Cited
 2021 OK CR 21, 497 P.3d 686, STATE ex rel. MATLOFF v. WALLACE
Cited
 2021 OK CR 27, ROTH v. STATE
Cited
 2021 OK CR 37, STATE v. LAWHORN
Discussed


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1992 OK CR 6, 825 P.2d 277, CRAVATT v. STATE
Discussed
 1926 OK CR 259, 248 P. 877, 35 Okl.Cr. 116, Armstrong v State
Discussed
 2009 OK CR 16, 207 P.3d 397, MAGNAN v. STATE
Discussed
 2013 OK CR 5, 298 P.3d 1192, STATE v. DELSO
Discussed
 2021 OK CR 3, 484 P.3d 286, WITHDRAWN
Discussed
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 13.1, Required Service of Minimum Percentage of Sentence - Offenses Specified
Cited
 21 O.S. 1378, Punishment for Planning or Threatening Violent Act
Cited
 21 O.S. 1211.1, Interruption, Disruption, or Interference With Emergency Telephone Call - Penalties
Cited
 21 O.S. 644, Punishment for Assault and Battery
Discussed
 21 O.S. 751, Definition of Maiming
Cited
 21 O.S. 1283, Convicted Felons and Delinquents
Cited
 21 O.S. 1289.16, Felony Pointing Firearms
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 846, Procedure Where Another County Has Exclusive Jurisdiction
Cited


 
 








 
 
 
 

 
 




 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA