SPEARS v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:SPEARS v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 SPEARS v. STATE
2021 OK CR 7
485 P.3d 873
Case Number: F-2019-330
Decided: 04/01/2021
MICHAEL EUGENE SPEARS, Appellant v. STATE OF OKLAHOMA, Appellee.
Cite as: 2021 OK CR 7, 485 P.3d 873

 

 

O P I N I O N

ROWLAND, VICE PRESIDING JUDGE:

¶1 Michael Eugene Spears was tried by jury in the District Court of Rogers County, Case No. CF-2017-1013, and convicted of First Degree Murder, in violation of 21 O.S.Supp.2012, § 701.7. In accordance with the jury's recommendation, the Honorable Sheila Condren sentenced Spears to life imprisonment with the possibility of parole.

¶2 Spears appeals his Judgment and Sentence raising the following issues:

(1) whether the State of Oklahoma lacked jurisdiction to prosecute him;

(2) whether the evidence was sufficient to prove all elements of first degree murder;

(3) whether he was prejudiced by the admission of improper and speculative expert opinion testimony;

(4) whether the trial court erred in allowing the prosecution to define reasonable doubt; and

(5) whether he received ineffective assistance of counsel.

¶3 Because we find relief is required on Spears's jurisdictional challenge in Proposition 1, his other claims are moot. Spears claims the State of Oklahoma did not have jurisdiction to prosecute him relying upon 18 U.S.C. § 1153 and McGirt v. Oklahoma, 140 S.Ct. 2452 (2020).

¶4 On August 19, 2020, this Court remanded this case to the District Court of Rogers County for an evidentiary hearing. The District Court was directed to make findings of fact and conclusions of law on two issues: (a) Spears's status as an Indian; and (b) whether the crime occurred in Indian Country, namely within the boundaries of the Cherokee Nation Reservation. Our order provided that, if the parties agreed as to what the evidence would show with regard to the questions presented, the parties could enter into a written stipulation setting forth those facts, and no hearing would be necessary.

¶5 On September 28, 2020, the parties appeared for an evidentiary hearing and filed written stipulations. On November 12, 2020, the District Court filed its Findings of Fact and Conclusions of Law. We discuss the stipulations and District Court's Findings of Fact and Conclusions of Law below.

A. The Major Crimes Act

¶6 Title 18 Section 1153 of the United States Code, known as the Major Crimes Act, grants exclusive federal jurisdiction to prosecute certain enumerated offenses committed by Indians within Indian country. It reads in relevant part as follows:

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

18 U.S.C. § 1153(a) (2013).

¶7 The first degree murder charge fits squarely within the Major Crimes Act and its exclusive federal jurisdiction.

B. McGirt v. Oklahoma

¶8 Federal statutes asserting federal criminal jurisdiction in Indian country are more than one hundred years old. What has recently changed is the definition of Indian country, within the borders of Oklahoma, for purposes of these statutes. In McGirt v. Oklahoma, 140 S.Ct. 2452 (2020) the Supreme Court held that land set aside for the Muscogee Creek Nation in the 1800's was intended by Congress to be an Indian reservation, and that this reservation exists today for purposes of federal criminal law because Congress never explicitly disestablished it. Although the case now before us involves the lands of the Cherokee Nation, we find McGirt's reasoning controlling.

C. Questions Upon Remand

1. Spears's Status as Indian

¶9 The parties agreed by stipulation that (1) Spears has some Indian blood (2) he was an enrolled member of the Cherokee Nation on the date of the charged offense; and (3) the Cherokee Nation is a federally recognized tribe. The District Court accepted this stipulation and reached the same conclusion in its Findings of Fact and Conclusions of Law.

2. Whether Crime Was Committed in Indian Country

¶10 As to the second question on remand, whether the crime was committed in Indian country, the stipulation of the parties was less dispositive. They agreed only that the charged crime occurred within the historical geographic area of the Cherokee Nation as designated by various treaties.

a. Establishment of the Cherokee Reservation

¶11 In a thorough and well-reasoned order, the District Court examined the 19th century treaties between the Cherokee Nation and the United States of America. The court noted that "[t]he Cherokee treaties were negotiated and finalized during the same period of time as the Creek treaties, contained similar provisions that promised a permanent home that would be forever set apart, and assured a right to self-government on lands that would lie outside both the legal jurisdiction and geographic boundaries of any state."[1] The District Court concluded that the current boundaries of the Cherokee Nation are as established in the 1833 Treaty with the Western Cherokee, 1835 Treaty with the Cherokee, 1846 Treaty with the Cherokee, and the 1866 Treaty with the Cherokee.

¶12 The District Court found, "[l]ike Creek treaties, the Cherokee treaties that promised land in Indian Territory to the Cherokee Nation established the tribe's relationships with that land and created a reservation." This finding is consistent with McGirt, where the majority found it "obvious" that a similar course of dealing between Congress and the Creeks had created a reservation, even though that term had not always been used to refer to the lands set aside for them, "perhaps because that word had not yet acquired such distinctive significance in federal Indian law." McGirt, 140 S.Ct. at 2461.

b. Failure to Disestablish the Cherokee Reservation

¶13 "To determine whether a tribe continues to hold a reservation, there is only one place we may look: the Acts of Congress." McGirt, 140 S.Ct. at 2462. No particular words or verbiage are required, but there must be a clear expression of congressional intent to terminate the reservation.

History shows that Congress knows how to withdraw a reservation when it can muster the will. Sometimes, legislation has provided an "[e]xplicit reference to cession" or an "unconditional commitment ... to compensate the Indian tribe for its opened land." Ibid. Other times, Congress has directed that tribal lands shall be "'restored to the public domain.'" Hagen v. Utah, 510 U.S. 399, 412, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) (emphasis deleted). Likewise, Congress might speak of a reservation as being "'discontinued,'" "'abolished,'" or "'vacated.'" Mattz v. Arnett, 412 U.S. 481, 504, n. 22, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). Disestablishment has "never required any particular form of words," Hagen, 510 U.S., at 411, 114 S.Ct. 958. But it does require that Congress clearly express its intent to do so, "[c]ommon[ly with an] '[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests.'" Nebraska v. Parker, 577 U. S. 481, -------- -- --------, 136 S.Ct. 1072, 1079, 194 L.Ed.2d 152 (2016).

Id. 140 S.Ct. 2462--63.

¶14 The record before the District Court in this case, similar to that in McGirt, shows Congress, through treaties, removed the Cherokee people from one area of the United States to another where they were promised certain lands. Subsequent treaties redefined the geographical boundaries of those lands, but nothing in any of those documents showed a congressional intent to erase the boundaries of the reservation and terminate its existence. Congress, and Congress alone, has the power to abrogate those treaties, and "this Court [will not] lightly infer such a breach once Congress has established a reservation." McGirt, 140 S.Ct. at 2462 (citing Solem v. Bartlett, 465 U.S. 463, 470 (1984)).

¶15 Noting that the State of Oklahoma presented no evidence to show that Congress erased or disestablished the boundaries of the Cherokee Nation Reservation, the District Court found that the Cherokee Reservation remains in existence. This finding is supported by the record.

¶16 We hold that for purposes of federal criminal law, the land upon which the parties agree Spears allegedly committed the crime is within the Cherokee Reservation and is thus Indian country. The ruling in McGirt governs this case and requires us to find the District Court of Rogers County did not have jurisdiction to prosecute Spears. Accordingly, we grant relief based upon argument raised in Proposition 1.

DECISION

¶17 The Judgment and Sentence of the District Court is VACATED. The matter is REMANDED WITH INSTRUCTIONS TO DISMISS. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2021), the MANDATE is ORDERED to issue in twenty (20) days from the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF ROGERS COUNTY
THE HONORABLE SHEILA CONDREN, DISTRICT JUDGE

 
 
 
 APPEARANCES AT TRIAL

 JACK E. GORDON, JR.
 ATTORNEY AT LAW
 111 S. MUSKOGEE AVE.
 CLAREMORE, OK 74017
 COUNSEL FOR DEFENDANT
 LAWRENCE A. MARTIN
 ATTORNEY AT LAW
 123 S. BROADWAY
 CLEVELAND, OK 74020
 COUNSEL FOR DEFENDANT
 
 
 APPEARANCES ON APPEAL

 JAMES H. LOCKARD
 DEPUTY DIVISION CHIEF
 HOMICIDE DIRECT APPEALS
 DIVISION
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR APPELLANT
 
 
 
 
 ISAAC SHIELDS
 ASST. DISTRICT ATTORNEY
 ROGERS COUNTY COURTHOUSE
 200 S. LYNN RIGGS BLVD.
 CLAREMORE, OK 74017
 COUNSEL FOR STATE
 
 
 MIKE HUNTER
 ATTORNEY GENERAL
 OF OKLAHOMA
 KEELEY L. MILLER
 ASSISTANT ATTORNEY
 GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 
 

APPEARANCES ON REMAND

 
 
 
 MATT BALLARD
 DISTRICT ATTORNEY
 ROGERS COUNTY COURTHOUSE
 200 S. LYNN RIGGS BLVD.
 CLAREMORE, OK 74017
 COUNSEL FOR STATE

 JAMES H. LOCKARD
 DEPUTY DIVISION CHIEF
 HOMICIDE DIRECT APPEALS
 DIVISION
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR APPELLANT
 
 
 MIKE HUNTER
 ATTORNEY GENERAL
 OF OKLAHOMA
 RANDALL YOUNG
 JULIE PITTMAN
 ASSISTANT ATTORNEY
 GENERALS
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR STATE

 SARA HILL
 CHRISSI NIMMO
 CHEROKEE NATION OFFICE
 OF THE ATTORNEY GENERAL
 P.O. BOX 1533
 TAHLEQUAH, OK 74465
 
 
 

 

OPINION BY: ROWLAND, V.P.J.
KUEHN, P.J.: Concur
LUMPKIN, J.: Concur in Results
LEWIS, J.: Specially Concur
HUDSON, J.: Concur in Results

FOOTNOTES

[1] This Court has also acknowledged that, "[t]he treaties concerning the Five Tribes which were resettled in Oklahoma in the mid-1800s (the Muscogee Creek, Cherokee, Chickasaw, Choctaw, and Seminole) have significantly similar provisions; indeed, several of the same treaties applied to more than one of those tribes." Bosse v. State, 2021 OK CR 3, ¶ 5, __ P.3d __, __.

LUMPKIN, JUDGE: CONCURRING IN RESULTS:

¶1 Bound by my oath and the Federal-State relationships dictated by the U.S. Constitution, I must at a minimum concur in the results of this opinion. While our nation's judicial structure requires me to apply the majority opinion in the 5-4 decision of the U.S. Supreme Court in McGirt v. Oklahoma, __ U.S. __, 140 S. Ct. 2452 (2020), I do so reluctantly. Upon the first reading of the majority opinion in McGirt, I initially formed the belief that it was a result in search of an opinion to support it. Then upon reading the dissents by Chief Justice Roberts and Justice Thomas, I was forced to conclude the Majority had totally failed to follow the Court's own precedents, but had cherry picked statutes and treaties, without giving historical context to them. The Majority then proceeded to do what an average citizen who had been fully informed of the law and facts as set out in the dissents would view as an exercise of raw judicial power to reach a decision which contravened not only the history leading to the disestablishment of the Indian reservations in Oklahoma, but also willfully disregarded and failed to apply the Court's own precedents to the issue at hand.

¶2 My quandary is one of ethics and morality. One of the first things I was taught when I began my service in the Marine Corps was that I had a duty to follow lawful orders, and that same duty required me to resist unlawful orders. Chief Justice Roberts's scholarly and judicially penned dissent, actually following the Court's precedents and required analysis, vividly reveals the failure of the majority opinion to follow the rule of law and apply over a century of precedent and history, and to accept the fact that no Indian reservations remain in the State of Oklahoma.[1] The result seems to be some form of "social justice" created out of whole cloth rather than a continuation of the solid precedents the Court has established over the last 100 years or more.

¶3 The question I see presented is should I blindly follow and apply the majority opinion or do I join with Chief Justice Roberts and the dissenters in McGirt and recognize "the emperor has no clothes" as to the adherence to following the rule of law in the application of the McGirt decision?

¶4 My oath and adherence to the Federal-State relationship under the U.S. Constitution mandate that I fulfill my duties and apply the edict of the majority opinion in McGirt. However, I am not required to do so blindly and without noting the flaws of the opinion as set out in the dissents. Chief Justice Roberts and Justice Thomas eloquently show the Majority's mischaracterization of Congress's actions and history with the Indian reservations. Their dissents further demonstrate that at the time of Oklahoma Statehood in 1907, all parties accepted the fact that Indian reservations in the state had been disestablished and no longer existed. I take this position to adhere to my oath as a judge and lawyer without any disrespect to our Federal-State structure. I simply believe that when reasonable minds differ they must both be reviewing the totality of the law and facts.

FOOTNOTES

[1] Senator Elmer Thomas, D-Oklahoma, was a member of the Senate Committee on Indian Affairs. After hearing the Commissioner's speech regarding the Indian Reorganization Act (IRA) in 1934, Senator Thomas opined as follows:

I can hardly see where it (the IRA) could operate in a State like mine where the Indians are all scattered out among the whites and they have no reservation, and they could not get them into a community without you would go and buy land and put them on it. Then they would be surrounded very likely with thickly populated white sections with whom they would trade and associate. I just cannot get through my mind how this bill can possibly be made to operate in a State of thickly-settled population. (emphasis added).

John Collier, Commissioner of Indian Affairs, Memorandum of Explanation (regarding S. 2755), p. 145, hearing before the United States Senate Committee on Indian Affairs, February 27, 1934. Senator Morris Sheppard, D-Texas, also on the Senate Committee on Indian Affairs, stated in response to the Commissioner's speech that in Oklahoma, he did not think "we could look forward to building up huge reservations such as we have granted to the Indians in the past." Id. at 157. In 1940, in the Foreword to Felix S. Cohen, Handbook of Federal Indian Law (1942), Secretary of the Interior Harold Ickes wrote in support of the IRA, "[t]he continued application of the allotment laws, under which Indian wards have lost more than two-thirds of their reservation lands, while the costs of Federal administration of these lands have steadily mounted, must be terminated." (emphasis added).

LEWIS, JUDGE, SPECIALLY CONCURRING:

¶1 Based on my special writings in Bosse v. State, 2021 OK CR 3, ___ P.3d ___ and Hogner v. State, 2021 OK CR 4, ___ P.3d ___, I specially concur. Following the precedent of McGirt v. Oklahoma, 140 S.Ct. 2452 (2020), Oklahoma has no jurisdiction over an Indian who commits a crime in Indian Country, or over any person who commits a crime against an Indian in Indian Country. This crime occurred within the historical boundaries of the Cherokee Nation Reservation and that Reservation has not been expressly disestablished by the United States Congress. Additionally, Appellant is an Indian, thus the jurisdiction is governed by the Major Crimes Act found in the United States Code.

¶2 Oklahoma, therefore, has no jurisdiction, concurrent or otherwise, over Appellant in this case. Thus, I concur that this case must be reversed and remanded with instructions to dismiss. Jurisdiction is in the hands of the United States Government.

HUDSON, J., CONCUR IN RESULTS:

¶1 Today's decision applies McGirt v. Oklahoma, 140 S. Ct. 2452 (2020) to the facts of this case and dismisses a first degree murder conviction from Rogers County. I concur in the results of the majority's opinion based on the stipulations below concerning the Indian status of Appellant and the location of this crime within the historic boundaries of the Cherokee Reservation. Under McGirt, the State cannot prosecute Appellant because of his Indian status and the occurrence of this murder within Indian Country as defined by federal law. I therefore as a matter of stare decisis fully concur in today's decision. 

¶2 I disagree, however, with the majority's adoption as binding precedent that Congress never disestablished the Cherokee Reservation. Here, the State took no position below on whether the Cherokee Nation has, or had, a reservation. The State's tactic of passivity has created a legal void in this Court's ability to adjudicate properly the facts underlying Appellant's argument. This Court is left with only the trial court's conclusions of law to review for an abuse of discretion. We should find no abuse of discretion based on the record evidence presented. But we should not establish as binding precedent that the Cherokee Nation was never disestablished based on this record.

¶3 Finally, I maintain my previously expressed views on the significance of McGirt, its far-reaching impact on the criminal justice system in Oklahoma and the need for a practical solution by Congress. See Bosse v. State, 2021 OK CR 3, __P.3d__ (Hudson, J., Concur in Results); Hogner v. State, 2021 OK CR 4, __P.3d__ (Hudson, J., Specially Concurs); and Krafft v. State, No. F-2018-340 (Okl.Cr., Feb. 25, 2021) (Hudson, J., Specially Concurs) (unpublished).






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2021 OK CR 21, 497 P.3d 686, STATE ex rel. MATLOFF v. WALLACE
Discussed


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2021 OK CR 3, 484 P.3d 286, WITHDRAWN
Discussed at Length
 2021 OK CR 4, HOGNER v. STATE
Discussed
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 701.7, Murder in the First Degree
Cited


 
 








 
 
 
 

 
 




 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA